Shelby Gargis sued Consolidated Stores, Inc., d/b/a Big Lots ("Big Lots"), alleging a retaliatory discharge under Ala. Code 1975, § 25-5-11.1. Big Lots filed, in open court, a motion for issue preclusion, requesting that Gargis be precluded by reason of his Social *Page 270 
Security disability claim and award from claiming that he was willing and able to work. That motion was not formally ruled upon by the trial court. During the trial proceedings, Gargis and his economic expert testified regarding Gargis' receipt of Social Security disability benefits. Big Lots moved for a directed verdict, both at the close of Gargis' case and at the conclusion of the evidence. The trial court denied both motions. The jury returned a verdict for Gargis, awarding $150,000 in compensatory damages and $50,000 in punitive damages. The trial court entered a judgment on that verdict.
Big Lots filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. That motion was denied. Big Lots appealed. The supreme court transferred this case to this court pursuant to § 12-2-7(6), Ala. Code 1975.
 FACTS
Gargis was employed by Big Lots from November 7, 1988, until April 19, 1993, when he submitted his resignation. At the time of his resignation, Gargis was on a leave of absence due to a back injury. In his letter of resignation, Gargis stated that the company had pursued a campaign of harassment and discrimination against him. He stated that the company had refused to allow him to work within his restrictions and had not paid him the bonuses he was due; that he had been subjected to accusations of malingering and dishonesty; and that one of the managers had on numerous occasions threatened to fire him.
Gargis' first job with Big Lots was as the manager of its Decatur store. He was later promoted to manager of Big Lots' Florence store in April 1989. On July 17, 1989, Gargis injured his back while lifting a display case. On August 17, 1989, Gargis' treating physician, Dr. Earl Jeffres, released Gargis to return to work, with certain restrictions on his physical activities. Gargis returned to work as manager of the Florence store.
On December 8, 1989, Gargis reinjured his back when he slipped and fell on some ice at the loading dock. Gargis took a leave of absence from December 12, 1989, until October 1, 1990. During this time, Gargis received workmen's compensation benefits. Dr. Jeffres restricted Gargis to lifting 15 pounds, to sitting and standing intermittently, and to working no more than 8 hours a day. Gargis returned to work as an assistant manager of the Florence store because there was no manager's position available; however, Gargis received the same rate of pay he had received while working as manager.
A manager's position became available at the Scottsboro Big Lots store in 1991, and the position was offered to Gargis. He accepted the offer and was promoted to this position on August 18, 1991. On October 21, 1991, Gargis took another leave of absence, claiming that the pain in his back had become worse because the company had forced him to ride a bus to attend a managers' meeting in August 1991. Gargis testified that his doctor recommended that he not ride the bus but that Penny Davis, Big Lots' human resources manager, and David Taylor, Big Lots' district manager, refused to permit him to take an alternative form of transportation. Gargis stated that he agreed to pay for the alternative form of transportation. On the contrary, Penny Davis testified that she told Gargis he could take an alternative form of transportation to the meeting.
Gargis returned to work at the Scottsboro store on May 6, 1992, as an assistant manager because there was no manager's position available. Gargis received workers' compensation benefits during his leave of absence, and when he returned to work he received the same pay he had previously received. In January 1993, Gargis took another leave of absence due to back problems. While still on leave, Gargis resigned from his employment at the Scottsboro store.
Gargis supports his constructive discharge claim with the following facts. During Gargis' tenure at the Florence Big Lots store, Donnie Horton, the store manager, increased Gargis' work hours and workload beyond the limitations placed by his treating physician. Gargis states he complained to the district manager and the human resources manager but that neither of them ever corrected the *Page 271 
problem.[1] Gargis also claims that on numerous occasions, Mr. Horton and other management subjected him to insulting and humiliating remarks; e.g., remarks suggesting that Gargis was malingering and faking the injury. Gargis additionally claims that he was not included in the store managerial meetings.
Gargis contends that after February 1991 his workload was increased; that he was given duties of hourly employees instead of management functions; and that he was ordered to ride a bus to attend a managers' meeting in spite of his doctor's recommendation that he not do so. Gargis claims that the bus ride made his back injury worse and that, as a result, he had to take another leave of absence.
Gargis contends that when he moved to the Scottsboro store, the criticisms, insults, and harassments continued. One of Gargis' co-employees, Annie Fowler, testified that Ed Bolton, the store manager, would criticize and embarrass Gargis in the presence of other store employees and customers by accusing Gargis of malingering, being a dead-beat, faking his injuries, being lazy, and not performing his duties at the store. Ms. Fowler also testified that she heard Mr. Bolton make statements about firing Gargis and getting rid of him. Another co-employee testified and confirmed the testimony of Ms. Fowler.
Between October 1992 and January 1993, Gargis received two reprimands. One dealt with the unauthorized use of the company telephone for a long-distance call. The other reprimand was for tardiness and absenteeism. Gargis defended against the reprimand for absenteeism by stating that he was scheduled to be off work for a doctor's appointment. Gargis obtained a doctor's excuse, but it was dated January 19, 1993, after he had received the reprimand. These were the only two reprimands Gargis had ever received in his 29-year employment history.
During the time Gargis was off work in 1993, he learned that the company was not going to pay his bonuses that were due in March 1993. Gargis claims that this was the "final straw" that caused him to decide to resign from his employment with Big Lots. Following his resignation, however, Gargis received one of his bonus checks.
Gargis and Big Lots settled Gargis' workers' compensation claim. Big Lots paid his medical expenses and temporary total disability benefits in the amount of $25,466.75. Also, Big Lots paid Gargis a lump sum settlement of $50,000 and agreed to pay for all of Gargis' future medical treatment relating to his back injury.
 ISSUES
1. Whether the trial court erred in denying Big Lots' motions for directed verdict and for judgment notwithstanding the verdict.
2. Whether the trial court erred in denying Big Lots' motions for directed verdict and judgment notwithstanding the verdict on Gargis' punitive damages claim.
3. Whether the trial court erred in refusing Big Lots' requested jury charge number 16 on mitigation of damages.
 DISCUSSION 1. Big Lots' motions for directed verdict and JNOV.
Big Lots contends that the trial court erred in denying its motions for directed verdict and JNOV because, it argues, Gargis had failed to present substantial evidence to support his retaliatory discharge claim. "In reviewing the denial of motions for directed verdict and J.N.O.V., this Court must apply the same standard the trial court applies to its rulings on the motions." Motion Industries, Inc. v. Pate,678 So.2d 724, 726 (Ala. 1996). We must determine whether the party with the burden of proof presented sufficient evidence to require a jury determination of the issue. Id. at 726. We are governed by the "substantial evidence" rule *Page 272 
set forth in Ala. Code 1975, § 12-21-12(d). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co., 547 So.2d 870,871 (Ala. 1989). "This Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable inferences as the jury would be free to draw from the evidence." St. Clair Federal Sav. Bank. v. Rozelle,653 So.2d 986, 987 (Ala. 1995).
The retaliatory discharge statute is a legislatively created exception to the employment-at-will doctrine. It provides in pertinent part:
 "No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter. . . ."
Ala. Code 1975, § 25-5-11.1.
As remedial legislation, this section was enacted to offset the harsh effects of the employment-at-will doctrine. It should be construed liberally to effect its purpose. MotionIndustries, Inc., supra.
Our supreme court has interpreted this section to also include claims based on constructive discharge. See Twilley v.Daubert Coated Products, Inc., 536 So.2d 1364, 1368 (Ala. 1988). In Irons v. Service Merchandise Co., 611 So.2d 294 (Ala. 1992), our supreme court defined "constructive discharge" as follows:
 " '[I]f the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has [brought about] a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.' "
Irons, 611 So.2d at 295 (quoting Jurgens v. EEOC, 903 F.2d 386,390 (5th Cir. 1990)). Big Lots contends, on several bases, that Gargis failed to prove his constructive discharge claim and, therefore, that the trial court should have granted its motions for directed verdict or judgment notwithstanding the verdict.
A. Able and willing to work
First, Big Lots argues that the trial court erred in denying its motions for directed verdict and its motion for JNOV because, it says, Gargis presented no substantial evidence that he was "willing and able" to return to work. Big Lots claims that the ability to perform the functions of one's job is a necessary prerequisite to a claim alleging retaliatory discharge. Big Lots contends that the evidence in this case established that Gargis was not able to work at the time he tendered his resignation and was not able to work during the time up till the trial. Gargis had applied for, and had obtained, a finding of disability for Social Security purposes, retroactive to the date he last worked for Big Lots, which was some three months before he resigned. Big Lots reasons that inherent in § 25-5-11.1 is an implied requirement that the employee be willing and able to work. Big Lots maintains that logic dictates that if an employee is not willing and able to work, his employment termination cannot be wrongful or actionable under the statute because the employee could not or would not be working even if his employment had not been terminated. Furthermore, if an employee cannot work, his employer's alleged harassment cannot "force him into an involuntary resignation" so as to give rise to a claim for constructive discharge.
In Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122
(Ala. 1992), our supreme court stated that an employee may establish a prima facie case of retaliatory discharge by proving that he filed a worker's compensation claim for a work-related injury, that the injury prevented him from working for a period of time, and that when he returned to work, he was informed that he no longer had a job. The Court, by including the return-to-work element, impliedly recognized the principle that an employee must be willing and able to perform the job in order to assert a retaliatory discharge claim.
We would also note a couple of recent opinions addressing retaliatory discharge in the workers' compensation realm in which our supreme court has commented on the *Page 273 
plaintiff's presentation of evidence that he was willing and able to work, although the plaintiff was not allowed to return to work. See Motion Industries, Inc. v. Pate, 678 So.2d 724
(Ala. 1996), and National Security Insurance Co. v. Donaldson,664 So.2d 871 (Ala. 1995). These cases relied on Twilley v.Daubert Coated Prods., Inc., 536 So.2d 1364, 1365 (Ala. 1988), to again impliedly recognize a "willing and able" to return-to-work element of a retaliatory discharge claim.
Other cases are analogous in recognizing the requirement that an employee be willing and able to perform the functions of his job in order to assert a discharge claim against his employer.See, e.g., Texas Department of Community Affairs v. Burdine,450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) ("plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified . . . under Title VII"); Southeastern CommunityCollege v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367,60 L.Ed.2d 980 (1979) ("An otherwise qualified person [under the Rehabilitation Act] is one who is able to meet all of a program's requirements in spite of his handicap."); McDonnellDouglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824,36 L.Ed.2d 668 (1973) (plaintiff must show that he applied and was qualified for a job in order to prove a Title VII claim);Pushkin v. Regents of the University of Colorado,658 F.2d 1372, 1387 (10th Cir. 1981) (plaintiff must show that he was an otherwise qualified handicapped person, apart from his handicap). See also Parham v. Carrier Corp., 9 F.3d 383 (5th Cir. 1993) (court held that the plaintiff had failed to establish a "causal nexus" between his filing of a workers' compensation claim and his discharge by his employer, based in part on the fact that the overwhelming evidence was that he was not physically able to work).
Big Lots supports its argument with a persuasive case from Pennsylvania. Alexander v. Red Star Exp. Lines of Auburn, Inc.,646 F. Supp. 672 (E.D.Pa. 1986), aff'd 813 F.2d 396 (3d Cir. 1987). In that case, the plaintiff was hired by the employer as a dock foreman. The plaintiff suffered an injury to his right knee. He applied for and was awarded workmen's compensation benefits. Several months later, the plaintiff returned to work as a dispatcher, but his knee became so swollen that he was unable to continue working. He again applied for and received workmen's compensation benefits. The next month, a manager of the company informed the plaintiff that if he did not return to work, he would be removed from the payroll and his benefits would be terminated. The plaintiff received a letter from the company discussing the termination of his group insurance coverage. Shortly after the plaintiff initiated state court proceedings, the manager offered the plaintiff two light-duty positions. The plaintiff did not reply.
Several weeks before trial, the plaintiff became physically able to work again as a dock foreman, but he did not inform the workmen's compensation carrier or the company of that fact. The plaintiff refused to return to work for the company because he believed he had been fired when he received a letter from the company discussing termination of the plaintiff's group insurance benefits.
The jury returned a verdict finding that the plaintiff had proven by a preponderance of the evidence that the company had discharged him in retaliation for exercising his rights under the Workmen's Compensation Act of Pennsylvania and finding that the plaintiff had been damaged by the retaliatory conduct. The company moved for a directed verdict at the close of the evidence, and it later filed a motion for judgment notwithstanding the verdict. In granting the JNOV, the district court noted, in part, that the only reasonable conclusion to be drawn from the evidence was that the plaintiff could not perform his former work during the period, although he had testified that he could. The court further stated that if the plaintiff could not work, then the defendant was entitled to a JNOV because the company had no obligation to furnish wages or other fringe benefits to the plaintiff when he was physically unable to work.
Based on the above-referenced cases, we conclude that an essential element of a retaliatory discharge claim is the plaintiff's willingness and ability to return to work. *Page 274 
This principle applies in constructive discharge claims, too. In this case, Gargis was on leave when he resigned. In his deposition, Gargis stated that he did not attempt to seek other employment while he was on leave; however, at trial, Gargis clarified his deposition testimony by stating that he did not seek outside employment from January 1993, through April 1993, when he resigned. He testified that after his resignation, he did apply for other jobs but was not successful in obtaining other employment.
Also during this time, Gargis applied for, and later received, Social Security disability benefits. The administrative law judge ("ALJ") found Gargis disabled since January 18, 1993. "The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In order to meet this definition, Gargis had to prove that he had a severe impairment that made him unable to do his previous work or any other substantial gainful activity that exists in the national economy. Id. In considering whether Gargis was disabled, the ALJ evaluated his residual functional capacity and his age, education, and work experience. Id. After considering all these factors, the ALJ determined that Gargis was disabled and, thus, entitled to Social Security disability benefits.
Gargis' application for Social Security disability benefits, on the claim that he was unable to work, contradicts any claim Gargis has that he was willing and able to return to work and would have returned if the working conditions had not been so intolerable. Gargis' application for Social Security disability benefits negates his claim that he could perform the necessary functions of his job. Therefore, Gargis failed to satisfy an essential element of a retaliatory discharge claim — that he was willing and able to perform the necessary functions of his job.
B. Judicial estoppel
Big Lots also argues that Gargis is barred by principles of judicial estoppel and the doctrine of inconsistent positions from claiming that he is able to work. "In applying the doctrine of judicial estoppel this Court considers the relationship between the litigant and the judicial system. The doctrine applies to preclude a party from assuming a position in a legal proceeding inconsistent with a position previously asserted." Luna v. Dominion Bank, 631 So.2d 917 (Ala. 1993).See also Selma Foundry Supply Co. v. Peoples Bank TrustCo., 598 So.2d 844 (Ala. 1992). The doctrine of judicial estoppel serves to protect the integrity of judicial proceedings, not the parties. Muellner v. Mars, Inc.,714 F. Supp. 351, 356 (N.D.Ill. 1989).
Our supreme court addressed the issue of judicial estoppel inRussell v. Russel, 404 So.2d 662, 665 (Ala. 1981). The court noted that a party who has assumed a particular position in a judicial proceeding is estopped from asserting a position inconsistent with the first one to the prejudice of an adverse party. In order for one to invoke the doctrine of judicial estoppel, it is essential that the inconsistent position first asserted has been successfully maintained. Edwards v. McCord,461 So.2d 1319, 1320 (Ala. 1984). The application of judicial estoppel in quasi-judicial proceedings has not been discussed by our supreme court.
We find persuasive the language expressed by the Illinois court in Department of Transp. v. Grawe, 113 Ill. App.3d 336,341-42, 69 Ill.Dec. 250, 254, 447 N.E.2d 467, 471 (1983), andDepartment of Transp. v. Coe, 112 Ill. App.3d 506, 510-11, 68 Ill.Dec. 58, 60, 445 N.E.2d 506, 508 (1983). In those cases, the Illinois courts noted that the doctrine of judicial estoppel has evolved to include five elements: (1) the two positions must be taken by the same party; (2) the positions must be taken in judicial or quasi-judicial administrative proceedings; (3) the records of the two proceedings must clearly reflect that the party to be estopped intended the triers of fact to accept the truth of the facts alleged in support of the positions; (4) the party taking the positions must have been successful in maintaining the first position and must have received some benefit thereby in the first proceeding; and (5) the two positions must *Page 275 
be totally inconsistent. The Illinois court found "no reason to distinguish between judicial and quasi-judicial proceedings in the application of the doctrine [because] [a]dministrative agencies need to ascertain the truth of the parties' positions in order to resolve . . . disputes." Muellner,714 F. Supp. at 357 (citations omitted). "The truth is no less important to an administrative body acting in a quasi-judicial capacity than it is to a court of law." Id. (citations omitted). Additionally, we would note that disputes that arise in administrative proceedings often find their way through administrative review to courts of law. Coe, 112 Ill. App. 3d at 510, 68 Ill.Dec. at 60, 445 N.E.2d at 508. Thus, it would be illogical to allow parties to take an inconsistent position in a subsequent court proceeding simply because the party did not assert the first position under formal oath. Id.
Our supreme court in Porter v. Jolly, 564 So.2d 434, 437
(Ala. 1990), discussed the "doctrine of inconsistent positions." The court stated that in Alabama a party will not be permitted to maintain an inconsistent position or to take a position in regard to a matter that is directly contrary to one previously asserted by him, at least where he had full knowledge of the facts and where another would be prejudiced by his action. However, the doctrine of inconsistent positions has several limitations: (1) the prior position must have been asserted successfully and a judgment rendered in favor of the party against whom the doctrine is asserted; (2) the positions must be clearly inconsistent; (3) the parties and the questions must be the same; (4) the party claiming estoppel must have been misled and/or must have changed his position in reliance on the prior inconsistent position; and (5) it must be unjust to one party to permit the other to change positions. Pendleyv. Pendley, 581 So.2d 470, 473 (Ala. 1991); Aetna Life Cas.Co. v. Atlantic Gulf Stevedores, 590 So.2d 205, 208-09 (Ala. 1991).
All of the limitations of the doctrine of inconsistent positions are not met in the present case: Gargis was successful in his prior assertion that he was unable to work; his positions in the different proceedings are contrary; and it is unfair to Big Lots to permit these contrary positions; however, the parties are not the same — Big Lots was not a party in Gargis' action for Social Security disability benefits and Big Lots has not changed position in reliance on Gargis' prior inconsistent position. In order to protect the integrity of the judicial process, however, we find the doctrine applicable in the present case. The application of this doctrine is closely related to our earlier pronouncement regarding the element a plaintiff must establish in order to successfully prove a retaliatory discharge claim: that the plaintiff is willing and able to perform the necessary functions of the job.
Additionally, the general rule is that allegations made in a prior case or proceeding do not operate as a technical estoppel by record against the party making the allegations; however, this rule is normally applicable in cases where the allegations are not inconsistent with the position subsequently assumed by the party making the allegations. See 31 C.J.S. Estoppel § 7 (1964). Gargis made inconsistent allegations regarding his ability to work. To obtain his Social Security disability benefits, Gargis alleged that he was unable to perform his work. To support his claim of a constructive discharge, Gargis alleged the contrary — that he had the ability to work. Therefore, the general rule does not apply in this case, because Gargis made inconsistent statements in different proceedings.
Gargis petitioned the Social Security Administration ("SSA") for a determination of disability and an award of benefits. Gargis stated in his petition that he was unable to work because of the pain in his back. Following Gargis' request for reconsideration after the SSA had denied his original petition for benefits, the SSA found that Gargis had been disabled since January 18, 1993. This was the last day Gargis worked for Big Lots. The ALJ found specifically:
 "1. The claimant (Gargis) met the disability insured status requirements of the Act on January 18, 1993, the date the claimant stated he/she became unable to work, and has not engaged in substantial gainful activity since that date.
". . . . *Page 276 
 "4. The claimant lacks the residual functional capacity to perform sustained activity at any exertional level.
 "5. The claimant is unable to perform past relevant work as a manager and assistant manager of a retail store, a salesman, and a crane operator.
". . . .
 "7. The claimant does not have any transferable skills to perform other work within his/her physical and mental residual functional capacity.
". . . .
 "9. The claimant has been under a 'disability,' as defined in the Social Security Act, since January 18, 1993."
At the time of trial, Gargis continued to receive his Social Security disability benefits.
Big Lots contends that the doctrine of judicial estoppel precludes Gargis from asserting an ability to work, to establish a constructive retaliatory discharge claim, because he had maintained a contrary position — that he was unable to work — in the administrative proceeding to obtain Social Security disability benefits. Big Lots cites Muellner v. Mars,Inc., 714 F. Supp. 351 (N.D.Ill. 1989), in support. InMuellner, the employee was injured on the job, collected workers' compensation benefits, and ultimately was placed on long-term disability. The employee filed a claim for, and was awarded, Social Security disability benefits. According to company policy, the company terminated the employee's employment after she had been on long-term disability for two years. She was advised, however, that she would continue to receive her long-term disability benefits. After the employee's benefits were discontinued, she sued her employer, alleging several claims, including a retaliatory discharge claim. She maintained that she had not been disabled at any time and that she had been placed on disability leave because she had refused to accept early retirement.
The employer moved for a summary judgment, claiming that a prerequisite to recovery on any of the employee's claims was proof of an ability to work and that the employee was estopped to contradict her earlier statements that she was disabled and unable to work. The court initially noted the doctrine of judicial estoppel, stating that it prevents a party who has successfully maintained a position in one proceeding from asserting the contrary in another proceeding. "In order to have successfully maintained a prior position the party must have prevailed in the prior proceeding on that issue, though not necessarily on the merits." Id. at 356. The court further stated that the purpose of judicial estoppel is to prevent a party from " 'playing fast and loose with the courts.' " Id.
(citations omitted). The court concluded that the employee was estopped from asserting an ability to perform the duties of her job, which was a necessary prerequisite to her success on her claim of retaliatory discharge. Id. at 360.
Big Lots contends that Muellner is directly analogous to the present case. Gargis represented to the SSA that he was completely disabled from performing his job duties, obtained a disability determination so finding, and continued to receive disability benefits on that basis at the time of trial. Gargis then took the position in this case that he was capable of working and performing the duties of his job, in order to establish his retaliatory discharge claim based on a constructive discharge.
We note a Michigan case that contradicts Big Lots' argument regarding judicial estoppel. In Paschke v. Retool Industries,445 Mich. 502, 510, 519 N.W.2d 441, 444 (1994), the Michigan Supreme Court held that a representation made by an individual before the state unemployment commission — that he was willing and able to work in order to secure unemployment benefits — could not be used to preclude a subsequent claim that he had been totally disabled during that same period, in order to obtain workers' compensation benefits. The court found no indication that the plaintiff's representations themselves were wholly inconsistent. The court determined that a lower court's decision implied that it was the nature of the claims that was inconsistent; i.e., that a claim that one is able and available for work is inherently inconsistent with a claim of total disability for the same period. The court noted that *Page 277 
many other jurisdictions had refused, absent legislative authorization, to deny or diminish workers' compensation benefits on the basis of representations, made for unemployment compensation purposes, that a claimant was ready and able to work. 445 Mich. 502, 514 n. 9, 519 N.W.2d at 446. Finally, the court noted that there was no support in Michigan's statute for the conclusion that the plaintiff's receipt of unemployment benefits estops the plaintiff from asserting a claim of total disability for the same period.
We find Muellner the more analogous and persuasive case in this case. The doctrine of judicial estoppel and the doctrine of inconsistent positions apply in the present case. In addition to receiving Social Security disability benefits on the basis that he was unable to perform the necessary functions of his job, Gargis also received a settlement regarding his worker's compensation claims, based on the same rationale. Big Lots paid all Gargis' medical bills related to his back injury and agreed to continue paying his medical bills for any treatment related to his back injury. The settlement is based upon Gargis' assertion that he did not have the ability to perform the necessary functions of his job. He claims he attempted to work within his doctor's recommended limitations, but that Big Lots did not accommodate him. The trial testimony contradicts this. Several employees and management personnel of Big Lots testified that a desk and chair were positioned in the front of the store for Gargis to use when he needed them. Many of Gargis' tasks were modified to fit within his limitations. Thus, it appears that Big Lots provided Gargis with all reasonable accommodations and that Gargis was still unable to perform the necessary functions of his job.
Both doctrines preclude Gargis from claiming, in order to receive Social Security disability benefits, that he is unable to work, and then claiming, in order to prove a retaliatory discharge claim based on a constructive discharge, that he is willing and able to work. Accordingly, the trial court erred in denying Big Lots' motions for a directed verdict and for a JNOV. Those motions were based on the argument that Gargis was estopped from maintaining an inconsistent position that is directly contrary to a position previously asserted by him in the Social Security proceedings and therefore was unable to prove he was willing and able to perform the necessary functions of his job.
We pretermit discussion of Big Lots' remaining arguments. The judgment of the trial court is reversed and the cause is remanded for further proceedings or an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THIGPEN, J., concurs.
MONROE, J., concurs specially.
YATES, J., concurs in the result.
ROBERTSON, P.J., dissents.
[1] At trial, Penny Davis testified that Gargis never telephoned and complained to her about his work conditions. Davis told Gargis to contact her any time he had a problem, but that he did not contact her. Davis also testified that she explained to Gargis' supervisors that Gargis' doctor had placed him under certain work limitations.