725 So.2d 960 (1998)
DUNLOP TIRE CORPORATION
v.
Mickey ALLEN.
1941845.
Supreme Court of Alabama.
October 2, 1998.
Rehearing Denied November 20, 1998.
*961 D. Edward Starnes III and Jeffrey T. Kelly of Lanier Ford Shaver & Payne, P.C., Huntsville, for appellant.
Jimmy Alexander and Robert M. Baker of Alexander, Corder, Plunk & Baker, P.C., Athens, for appellee.
SHORES, Justice.
Mickey Allen filed a retaliatory-discharge action against Dunlop Tire Corporation (hereinafter "Dunlop") pursuant to Ala.Code 1975, § 25-5-11.1, claiming that his employment with Dunlop had been terminated solely because he had instituted an action against Dunlop to recover workers' compensation benefits. After a trial on the merits, the jury returned a verdict for Allen, awarding him $65,000 in past damages, $735,000 in future damages, and $1.2 million in punitive damages. Dunlop appealed the trial court's denial of its alternative motions for a JNOV, for a new trial, for a remittitur of the compensatory damages award, or to alter, amend, or *962 vacate the judgment. On April 24, 1998, the plaintiff moved this Court to "reduce and remit the award of punitive damages awarded in the trial court from $1.2 million to $250,000, being a total remittitur of $950,000.00 from the award of punitive damages."
First, Dunlop argues that it is entitled to a new trial because three members of the jury venire, who were eventually selected as jurors, failed to disclose on voir dire examination that they had been involved in previous litigation. The trial court, in exercising its discretion, determined that the jurors' failure to respond had resulted in no actual prejudice to Dunlop. A reversal based on Dunlop's contention requires a showing of probable prejudice, and we will reverse only if the trial court abused its discretion. Land & Associates, Inc. v. Simmons, 562 So.2d 140 (Ala.1989).
The trial court held an extensive hearing on this issue, and it was in the best position to determine whether probable prejudice occurred as a result of the jurors' failure to respond to questions during voir dire. Land & Associates, 562 So.2d at 149. Under the facts of this case, we cannot say that the trial court abused its discretion by finding that Dunlop was not prejudiced as a result of what the court considered a misunderstanding, on the part of the jurors, of Dunlop's questions. Their failure to respond was clearly due to confusion over the questions and inadvertence, and was not due to willfulness or an attempt at falsification. We also find that the trial court's use of the term "actual prejudice," instead of probable prejudice, is not reversible error, because the record showed no evidence of prejudice, either actual or probable, to Dunlop.
Dunlop next contends that the trial court should have granted its motion for a JNOV, because, it argues, Allen had failed to present substantial evidence in support of his retaliatory-discharge claim. Reviewing Dunlop's contention requires us to apply the same standards the trial court applied when it ruled on the motion. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Like a motion for a directed verdict presented during trial, a JNOV motion challenging the sufficiency of the evidence is appraised by applying the "substantial evidence rule." § 12-21-12(a), Ala.Code 1975; Med Plus Properties v. Colcock Constr. Group, Inc., 628 So.2d 370, 373-74 (Ala.1993). The ultimate question is whether the party bearing the burden of proof presented substantial evidence in support of its position. Med Plus Properties, 628 So.2d at 373-74, citing § 12-21-12(d), Ala.Code 1975. "`Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Id., quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Our analysis requires us to review the evidence in a light most favorable to the party who secured the jury verdict and to consider the reasonable evidentiary inferences that the jury could have drawn. Carter v. Henderson, 598 So.2d 1350, 1353 (Ala. 1992).
Ala.Code 1975, § 25-5-11.1, provides:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...."
Initially, we note that the legislature's purpose in enacting this section was to offset the harsh effects of the employment-at-will doctrine. Morgan v. Northeast Alabama Regional Medical Center, 624 So.2d 560 (Ala. 1993). Because this is remedial legislation, intended to prevent instances of retaliatory discharge, "we apply the rule that the statute is to be construed liberally to effect its purposes." Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364, 1367 (Ala.1988). In Twilley, 536 So.2d 1364, 1369 (Ala.1988), the Court interpreted this section as it regards the prohibition against discharging an employee "solely" because the employee has made a workers' compensation claim. Culbreth v. Woodham Plumbing Co., 599 So.2d 1120, 1122 (Ala.1992). The Twilley court established the following test:
"We hold that an employee may establish a prima facie case of retaliatory discharge *963 by proving that he was `terminated' because he sought to recover [workers'] compensation benefits, which would be an impermissible reason. The burden would then shift to the defendant employer to come forward with evidence that the employee was terminated for a legitimate reason, whereupon the plaintiff [employee] must prove that the reason [given by the employer] was not true but a pretext for an otherwise impermissible termination."
Twilley, 536 So.2d at 1369. The Court of Civil Appeals has added:
"[I]n the prima facie stage of a retaliatory discharge case, a plaintiff need not `prove' that his employment was terminated for seeking workers' compensation benefits. If this were true, there would be no need to shift the burden. The prima facie level of the analysis is an initial inquiry that allows a court to determine whether there may be a valid claim and whether the case should proceed."
Beaulieu of America, Inc. v. Kilgore, 680 So.2d 288, 296 (Ala.Civ.App.1996). Chesser v. Mid-South Electrics, Inc., 652 So.2d 240, 242 (Ala.1994).
Under the facts presented here, the trial court correctly submitted the issue to the jury. Chesser v. Mid-South Electrics, Inc., 652 So.2d 240, 242 (Ala.1994). The court determines initially whether the employee has presented substantial evidence from which a jury could conclude "that he was `terminated' because he sought to recover [workers'] compensation benefits," Twilley, supra. The employee cannot leave that as an assumption for the court to make. See Hayden v. Bruno's, Inc., 588 So.2d 874 (Ala. 1991); Ala.Code 1975, § 12-21-12(a).
In Culbreth, supra, this Court elaborated on its holding in Twilley, addressing the method to follow after the employee has established a prima facie case:
"We note that it would be more appropriate to say that, after the defendant has met his burden of coming forward with evidence of a legitimate reason, `"[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons"' for terminating the plaintiff are not true. The plaintiff does not have to `prove' that the employer's stated reason is not true unless the defendant's evidence is sufficiently certain, without more evidence from the plaintiff, to support a directed verdict. If the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal, the jury might simply disbelieve the defendant."
Culbreth, 599 So.2d at 1122 (citations omitted). In other words, after the plaintiff makes out a prima facie case, the defendant must present, by substantial evidence, Ala. Code 1975, § 12-21-12(a), a legitimate reason for the termination, sufficient to establish that there is no genuine issue as to that fact and that the defendant is therefore entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. Only if the defendant satisfies this burden does the plaintiff have to produce enough evidence to refute that showing. Culbreth, 599 So.2d at 1122; Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996).
The evidence, viewed in a light most favorable to Allen, Carter, supra, tends to show the following: Allen began working at Dunlop in 1975. On August 20, 1982, Allen injured his left shoulder while working as a tire builder. He was off work intermittently and received workers' compensation benefits for two years. Having been medically disqualified from the tire-building position, he was assigned to a position as a machine cleaner.
On March 24, 1988, Allen injured his left knee while working as a machine cleaner. He was off work most of the time until February 12, 1990. During that period, he received workers' compensation benefits. In September 1988, Dr. Howard Miller performed arthroscopic surgery on Allen's knee. The surgery revealed a condoral fracture around the knee cartilage. Dr. Louis Horn concluded that Allen had a knee strain, chondromalacia of the patella, and crepitation. On February 15, 1989, Dr. Robert Mitchell performed surgery on Allen's knee in order to shave and smooth loosened cartilage that was affecting the injured area.
*964 From February through March 21, 1990, Dr. Mitchell treated Allen for complaints of swelling, soreness, and pain due to both the injury and the consequential reduction in muscle mass in Allen's left leg. Dr. Mitchell provided steroid injections to reduce the swelling and the pain and had Allen regularly attend physical therapy sessions to increase strength in the knee joint. Dr. Miller again examined Allen's knee on March 2, 1989. He agreed that Allen had a permanent partial impairment to the knee that was consistent with Allen's complaints throughout his treatment. Allen's injury had put him on crutches until July 1989; after postoperative treatment had improved his ability to extend his leg, Allen began using a cane to help his mobility. On August 16, 1989, Allen returned to work at Dunlop under a restricted, light-work status. On February 7, 1990, Dr. Mitchell felt that Allen was ready to return to his regular work activity. A good physical therapy report had shown full motion through the knee, with no swelling. Dr. Mitchell felt that Allen had a 20% permanent partial impairment of his left leg. Allen returned to his regular work activity, with restrictions, on February 12, 1990.
In June 1991, Allen received an injury not related to his work, a fractured ankle. He was out of work until September 17, 1991, when he returned to his past position as a tire builder. On March 27, 1992, Allen left that job because of foot problems not related to his work. On June 27, 1992, he returned to work again as a tire builder.
On August 21, 1992, Allen slipped in oil while working as a tire builder and reinjured his left knee. For this injury, Allen received workers' compensation benefits from August 21 to November 30, 1992. Dr. Davis, Dunlop's plant doctor, referred Allen to Dr. Horn, an orthopedic surgeon, who performed arthroscopic surgery on Allen's knee in October. The surgery revealed significant changes in the cartilage surrounding the knee, and revealed fragments of cartilage floating in the injured area. Dr. Horn used a small drill to remove some of the damaged cartilage. An MRI revealed that a small surface area of Allen's knee had developed a circulatory impairment. This circulatory impairment had caused a small portion of bone in his knee to die, and this condition further impaired the circulation to the knee. Dr. Horn testified that this condition is normally caused by trauma. On November 30, 1992, Dr. Horn, concluding that Allen had reached maximum medical improvement, considering his previous permanent physical impairment, released Allen to return to work, with no physical restrictions. Despite this fact, Dr. Horn did acknowledge that Allen clearly had suffered an anatomical injury of "functional significance," which, in his opinion, caused an estimated 7% impairment of Allen's leg.
Allen returned to work as a tire builder; the record establishes that this job is one of the hardest jobs at Dunlop. After about five hours of work, Allen reported to the plant nurse that he was experiencing pain and swelling in his knee. The nurse made Allen an appointment with Dr. Horn for the following day and iced down his leg. The nurse told Allen that he had to return to his job, but that, until the appointment, he could have ice applied to his leg three times a day. On December 2, 1992, Allen went to see Dr. Horn. Allen claims, however, that Dr. Horn did not examine his knee; that he merely stuck his head in the door and did not look at, or touch, his knee; and that the nurse returned to tell Allen, pursuant to Dr. Horn's directive, that he was to return to work. Dr. Horn's notes reflected that Allen would have "probable continued problems." At this point, Allen alleges, because Dr. Horn did not even examine his knee, he became very dissatisfied. For this reason, he requested that the nurse provide another physician to examine his knee. As a result, Dr. Davis, who is the plant doctor and a specialist in his field, examined Allen on December 3, 1992. His notes reflected Allen's comments that his left knee was making work unbearable. The notes stated that the pain existed when the leg was fully extended. Dr. Davis prescribed a "job change with no prolonged standing, walking, or climbing." Dr. Davis advised Allen that he could give the injury more time to resolve itself, or make a panel selection for another orthopedist.
Dunlop moved Allen from the tire-building job to a job performing light-duty work in *965 the plant's tire-repair area. Allen was assigned to work as a SRI Apex machine operator for a 12-hour shift; that work required climbing a three-step ladder 25-40 times per shift. Allen claims that Dunlop had jobs on 4 or 5 SRI machines that did not involve climbing, but that Dunlop did not assign Allen to any of those jobs. On February 22, 1993, Allen visited a non-Dunlop orthopedist, Dr. Bacon, who told him to limit his work activity to an 8-hour day, and a 40-hour week, with no squatting, climbing, or kneeling, and no climbing stairs for 2 months; however, the jobs at Dunlop were based on 12-hour shifts. Nevertheless, Dunlop did not consider Dr. Bacon as the treating physician, so it did not follow these restrictions.
Despite Dunlop's knowledge of Dr. Davis's restrictions, which prohibited climbing, and Dr. Bacon's restrictions, Allen began the job as an SRI Apex machine operator on February 23, 1993, a job that required him to climb three stairs about 25 to 40 times during his shift. On February 26, Allen filed a claim for workers' compensation benefits for his prior, August 1992, injury. The next day, February 27, Allen reinjured his left knee while descending the steps of the ladder of the SRI Apex machine. Allen reported the injury to the plant nurse, who "wrote it up" and sent Allen back to perform his job. Allen testified that he attempted to return to the nurse on the following day, February 28, but that his immediate supervisor, Robert Rogers, informed him that he could not see the nurse or go to the first aid office, and was to continue working. Allen did continue working; he stated that he was not allowed to see the nurse during February or March.
On April 9, 1993, Allen requested a panel selection of doctors, but Dunlop refused the request. On April 15, Allen again requested a panel selection and asked for a list of orthopedic surgeons, but Dunlop would not comply. Allen continued to work as an SRI Apex machine operator until May 1993, although he stated that his knee "kept getting worse" and that, to bear the pain, he would get cortisone shots from Dr. Bacon.
On May 7, 1993, when Allen arrived at work, he reported to his supervisor, Mr. Rogers, that he was having an extreme amount of pain, that he had been unable to get a cortisone shot from Dr. Bacon that day, and that he wanted to get some Advil, a medication, from the first-aid station. Rogers told him to begin his shift and that when Rogers could find a "relief man," Allen could go get some Advil. Allen testified that a relief man never arrived, so he turned off the SRI Apex machine and went to the first-aid station for the Advil. When he arrived at the first-aid station, he asked the nurse for the medication; however, the nurse told him that she could not treat him under any circumstances and that he was to return to his job. Allen told her that he needed a note before he went back, but she refused to give him one. Allen said that he was hurting so badly he could hardly walk, but that no one in "medical" would examine him. Upon returning to his machine, he saw Rogers and told him that he was having a great deal of pain and had to leave. Rogers replied by saying that he would not let him leave, but Allen had decided that he had to go home. When Allen arrived at home, he telephoned Rogers and told him that he had attempted to contact Dr. Bacon, but that the doctor was unable to see him until the following morning. A medical note of the circumstances occurring on May 7 stated the following:
"Dr. Horn did surgery on left knee, then Dr. Bacon set restrictions that aren't being followed here at Dunlophas asked for panel but has not received one yetcame to medical 8:40 p.m. 5/7/93 with complaints of great deal pain in [left] knee was not able to get cortisone injection todaywill probably leave work early tonight if pain persists."
The note had Rogers's name at the top of it and the initials "R.R." on the bottom of it.
On May 10, 1993, Allen saw Dr. Bacon. Dr. Bacon testified that Allen's last cortisone injection had provided two weeks of relief from the pain and the swelling, but that his symptoms had now recurred and had been aggravated by his activity level. Dr. Bacon again gave him restrictions to do only light work, with no squatting, kneeling, or crawling; to avoid stairs; and to work only eight-hour shifts for a period of three months. On May 19, 1993, Allen delivered a certified *966 letter to Dunlop stating his dissatisfaction with Dr. Horn and again requesting a panel selection of physicians.
On May 28, 1993, Allen was called into a meeting with one of his supervisors, David Bell, who informed Allen that Dunlop was suspending him without pay while it reviewed his record as an employee. Dunlop's reason for the suspension was that Allen had been placed in a job within the qualifications set by Dr. Horn, but had been unable to perform the assigned Job. Rick Ledsinger testified that the main reason for the suspension was Mickey Allen's "walking off the job." Mr. Bell added that their concern was whether Allen could, or wanted to, work at Dunlop. At the meeting, Max Wright, Allen's union representative, requested an opinion from another doctor as to whether Allen should have performed the job operating the SRI Apex machine in the first instance, but Dunlop refused.
In July 1993, Allen was hospitalized three days for two surgical proceduresarthroscopic surgery and tibial osteotomy, a procedure in which the doctor, in this case, Dr. Bacon, cuts the tibia (the bone below the kneecap) to realign the knee and to shift stress off the injured parts. After the surgery, Allen's left leg was placed in a whole-leg cast for 5-6 weeks and then placed in a smaller cast or brace that extended from his knee to his ankle.
On September 17, 1993, Dunlop notified Allen that he was terminated for "failing to make proper effort to perform [his] assigned job, exaggerating [his] degree of alleged disability, and malingering." In November, a "grievance meeting" was held between Dunlop and Allen's union. As a result of this meeting, Allen was supposedly "reinstated" at Dunlop and was paid sickness and accident benefits of $275 a week for one year through an insurance policy. At Dunlop's request, in June 1994 Allen saw Dr. Keith Anderson, who agreed with Dr. Bacon's limitations (except for the eight-hour-shift limitation), stating that although Allen was experiencing pain he could work a 12-hour shift with no squatting, climbing, or kneeling, and with no stair climbing for two months. Dr. Anderson stated that the goal would be to put Allen back to work to see if he functioned well; if so, Dunlop could increase his work activities. Allen claims that while there were jobs at Dunlop that he could have performed, such as clerical positions, Dunlop never again allowed him to return to work. Dunlop argues that Allen failed to return to work because there were no jobs that conformed to his physical limitations.
The first question is whether Allen presented substantial evidence from which a jury could conclude that he was terminated because he sought to recover workers' compensation benefits. Twilley, supra. We find that Allen did meet this burden. He presented substantial evidence to support his claim of retaliatory discharge, by presenting evidence of circumstances suggesting that the termination came in response to his having sought workers' compensation benefits.
Clearly, putting Allen into a position that eventually caused his termination was wrongfulhis job required him to climb a three-step ladder 25-40 times per shift; this climbing violated the limitation imposed by Dr. Davis, a Dunlop specialist, who had stated that Allen was to do "no climbing." When it allowed Allen to work as an SRI Apex machine operator, Dunlop had the findings of the arthroscopic surgery performed by Dr. Horn, which showed broken fragments of cartilage in Allen's knee, and it had the MRI, which showed a circulatory impairment. These facts, in addition to Dunlop's actively keeping Allen from seeking medical aid, taken in light of a "functionally significant" injury to his knee that impaired at least 7% of his entire left leg, showed a total lack of concern for Allen's safety. A jury could find that this progressive pattern of conduct, by which Allen was eventually terminated and was arguably prevented from reinstatement, supported Allen's allegation that he was really terminated solely because he had filed several claims for workers' compensation benefits. Therefore, we find that Allen established a prima facie case of retaliatory discharge.
Because Allen established a prima facie case, the burden shifted to Dunlop to present substantial evidence indicating that it had a legitimate reason for the termination, evidence *967 sufficient to establish that there was no genuine issue as to that fact and that Dunlop was therefore entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P; Culbreth, 599 So.2d at 1122; Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala. 1996). The evidence in the record does not tend to support the three reasons offered by Dunlop for terminating Allen: 1) failure to make a proper effort; 2) exaggeration; and 3) malingering.
While Allen was working as an SRI Apex machine operator, his performance was significantly better than that of his more experienced coemployees. According to the record, Allen's average performance percentage as an SRI Apex machine operator for the time before his suspension was 72%. During this period, Allen was new to the position, had an injured knee, and had left early from only one shift because of his injury. By contrast, the average performance percentage for the other SRI Apex machine operators during this period was only 58%. For each shift, Allen was either the top performer or one of the top performers, except for the shift in which he reinjured his knee. No employee during this period was terminated for maintaining a low production percentage, even though some employees' percentages ranged from 65% to 23%, or 57% to 38%. Allen, on the other hand, kept his rate above 70% for the most part, reaching 91% at his peak, and dropping to 35% on the day he reinjured his knee. Consequently, it cannot be said that Allen failed to make a proper effort at his job. His gradual decline in performance was not due to inadequate or improper effort, but, as Allen testified, was due to the worsening of his injury that occurred as time progressed.
With respect to Dunlop's contention that Allen was exaggerating the degree of his disability and was malingering, the record does not support Dunlop's contention. Dunlop's medical staff agreed that Allen had a permanent partial disability to his left leg. Dr. Mitchell went so far as to conclude that the leg had a permanent partial impairment of 20%. Allen had arthroscopic surgeries and an MRI test, which revealed a chrondral fracture, cartilage damage, cartilage fragmentation, and dead bone in the knee. After two surgeries, one to shave portions of the cartilage and another to remove cartilage fragments, Allen had to have his tibia cut and his knee realigned. Accordingly, the opinions of Dunlop's doctors clearly acknowledged that Allen's complaints of pain were consistent with his injury. In light of the objective medical findings and the remedial surgeries, we cannot say that the record contains substantial evidence sufficient to support Dunlop's contentions that Allen was faking and exaggerating the degree of his disability. Rather, we find that "the plaintiff's prima facie case is strong, and the defendant's evidence of an asserted reason is weak or equivocal." Culbreth, 599 So.2d at 1122 (citations omitted). Assuming that Dunlop had satisfied the directed verdict standard established by the Court in Culbreth, Allen had, nevertheless, presented substantial evidence to rebut the reasons proffered by Dunlop. We therefore hold that the trial court properly denied Dunlop's JNOV motion.
Dunlop next argues that the trial court erred by excluding from evidence the judgment entered on Allen's workers' compensation claim. "The decision to admit or to exclude evidence is within the discretion of the trial judge, and [this Court] will not reverse such a decision absent an abuse of discretion." City of Birmingham v. Moore, 631 So.2d 972, 974 (Ala.1994). Further, "the mere showing of error is not sufficient to warrant a reversal; it must appear that the appellant was prejudiced by that error." Id. at 973-74, citing Rule 45, Ala.R.App.P.; see also Industrial Risk Insurers v. Garlock Equip. Co., 576 So.2d 652, 658 (Ala.1991); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991). At the time of the trial in this present case, Allen's workers' compensation case was pending on appeal in the Court of Civil Appeals. The trial court ruled that while evidence relating to the workers' compensation claim was irrelevant and might mislead the jury, Dunlop could introduce evidence of the amount of the benefits awarded to Allen and that evidence of conflicting testimony offered in the workers' compensation case could be introduced for purposes of impeachment. We conclude that *968 this ruling by the trial court did not amount to an abuse of discretion and, therefore, that the trial court did not err by excluding from evidence the judgment entered on Allen's workers' compensation claim.
Dunlop next argues that the trial court erred in charging the jury with respect to lost wages. In Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378 (Ala.1993), this Court stated:
"Our standard for reviewing the trial court's instructions is plain. `In reviewing instructions to determine if they correctly set forth the applicable law, [this Court] must read and consider the charge as a whole.' The law is clear that the refusal of a requested charge is not error where the trial court's oral charge `substantially and fairly' covers the same principles as the requested charge. Rule 51 Ala. R. Civ. P; Hamilton Auto Parts, Inc. v. Rea, 580 So.2d 1328 (Ala.1991)."
628 So.2d at 384-85. Rule 51 provides, in pertinent part:
"The refusal of a requested, written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in charges given at the request of the parties."
We conclude that trial court's charge substantially and fairly covered the same principles as the instructions that Dunlop says the trial court should have given. Accordingly, we find no error in the record with respect to this contention.
Dunlop next contends that the jury's award of $735,000 in future damages was not authorized by the trial court's instructions. As required by Ala.Code 1975, § 6-11-3, the trial court used a verdict form that itemized damages by listing a separate space for past, future, and punitive damages. Dunlop did not object to the provision for future damages on the verdict form. The trial court instructed the jury that "[t]he form which you would use, if you reach a verdict for the plaintiff, has a place for past damages, future damages, punitive damages, and a total of all of them."
Because the verdict form on its face had a place for future damages if, according to the trial court, the jury reached a verdict for the plaintiff, we conclude that the jury was authorized to award future damages. The jury did not violate the trial court's instructions. Moreover, if Dunlop had thought that future damages were not recoverable in this action, it should have asked to have that category omitted from the itemization. See Ala.Code 1975, § 6-11-3.
That portion of the judgment awarding compensatory damages ($65,000 in past damages and $735,000 in future damages) is affirmed. Because the plaintiff presented no clear and convincing evidence that Dunlop acted with oppression or malice, the award of punitive damages is reduced to $0. If the plaintiff does not, within 28 days of the date of this opinion, file in this Court a remittitur of $1.2 million, then the defendant shall be granted a new trial.
AFFIRMED CONDITIONALLY.
ALMON, KENNEDY, and COOK, JJ., concur.
HOUSTON and LYONS, JJ., concur specially.
HOOPER, C.J., and MADDOX, J., dissent.
SEE, J., dissents and files statement of nonrecusal.
HOUSTON, Justice (concurring specially).
The majority opinion addresses what the appellant, Dunlop Tire Corporation, argues in its brief as its fifth contentionthat "the trial court erred in denying Dunlop's motion for JNOV, because Allen failed to prove by substantial evidence that he was terminated solely because he filed a claim for workers' compensation benefits." See Appellant's brief, pp. 54-62.
Dunlop's brief sets out the text of the termination letter given by Dunlop to Allen on September 17, 1993:
"This letter is to confirm our meeting of September 17, 1993. You are terminated from Dunlop Tire Corporation effective *969 September 17, 1993. As discussed in our meeting of the same date, your termination is for [1] failing to make proper effort to perform your assigned job, [2] exaggerating your degree of alleged disability, and [3] malingering."
At trial, Dunlop presented evidence indicating that the reasons stated in this letter were its reasons for terminating Allen. Rick Ledsinger, Dunlop's personnel manager, testified that Allen "was terminated for withholding efforts to perform his job, ... was terminated for exaggerating the extent of his injury [, and] was terminated for malingering." Appellant's brief, p. 56. There is evidence from which the trier of facts could infer that all of this was true. However, there is also substantial evidence indicating that Allen did not withhold efforts to perform his job, that he did not exaggerate the extent of his injury, and that he did not malinger. See the statement of facts in the majority opinion.
Who resolves these issues, under our law and our standards of review? The trial court? This Court? Or the entity that Allen had demanded as his trier of factsthe jury? Under our law and our standards of review, it has been, and still is, according to the majority opinion in this case, the jury.
I do not disagree with any of the law cited in Justice See's dissent. Two other Justices and I, who are concurring in the majority opinion, concurred in Harrison v. Southern Pine Electric Cooperative, 603 So.2d 1004 (Ala.1992). Four other Justices and I, who are concurring in the majority opinion, concurred in Smith v. Dunlop Tire Corp., 663 So.2d 914 (Ala.1995). These cases are distinguishable from this present case. Here, material issues of fact had to be resolved by the trier of facts. In Harrison and Smith there were no material issues of fact to be resolved by the trier of fact.
LYONS, Justice (concurring specially).
An employee must prove both a willingness and an ability to return to work, in order to establish a retaliatory dismissal from employment because of the employee's seeking workers' compensation benefits. Recent decisions of the Court of Civil Appeals have described the ability to return to work as an essential element of a retaliatory-discharge claim. See, e.g., Hammock v. Ryder Dedicated Logistics, Inc., 716 So.2d 215 (Ala. Civ.App.1998); Rice v. Bruno's, Inc., 705 So.2d 486 (Ala.Civ.App.1997); Watwood v. White Consol. Indus., Inc., 699 So.2d 210 (Ala.Civ.App.1997); Lambert v. Beverly Enterprises, Inc., 695 So.2d 44 (Ala.Civ.App. 1997); Consolidated Stores, Inc. v. Gargis, 686 So.2d 268 (Ala.Civ.App.), cert. denied, 686 So.2d 278 (Ala.1996). Because Allen's physician at the time of his discharge, Dr. Bacon, had restricted Allen to working only 8 hours per day, Allen offered evidence that he was not able to return to work at Dunlop, where employees are required to work 12-hour shifts. Allen also testified to his inability to return to work. However, as the majority opinion states, there was also evidence of Allen's ability to return to work.
In order to prevent this inconsistent evidence from creating a jury question, we would have to hold that Allen was judicially estopped from assuming a position inconsistent with that evidence that suggested he was unable to return to work. This we have not been asked to do.
HOUSTON, J., concurs.
SEE, Justice (dissenting).
I respectfully dissent. In my view, Mickey Allen failed to present substantial evidence indicating that Dunlop Tire Corporation ("Dunlop"), his employer, discharged him solely for filing a workers' compensation claim.

I.
Viewed in the light most favorable to Allen, the evidence suggests that during Allen's 18-year employment with Dunlop he suffered a number of injuries. After injuring his shoulder working as a tire builder in 1982, Allen filed for and received workers' compensation benefits. He was absent from work intermittently for a two-year period, but Dunlop did not terminate Allen's employment at that time. After injuring his left knee at work in 1988, Allen filed for and received workers' compensation benefits. He was absent *970 from work during most of the next two years, but Dunlop did not terminate Allen's employment at that time. After suffering non-work-related injuries to his ankle and foot in 1991 and 1992, Allen was absent from work for several months, but Dunlop did not terminate Allen's employment at that time.
In August 1992, Allen suffered the injury that is the subject of this dispute. He reinjured his left knee when he slipped after stepping in oil. As a result of this injury, Dr. Louis Horn, Allen's treating physician, performed arthroscopic surgery on Allen's knee. Allen filed for and received workers' compensation benefits and was absent from work for several months, but Dunlop did not terminate Allen's employment at that time.
In December 1992, Allen returned to work with no medical limitations imposed by Dr. Horn. After working only a short time, Allen complained of pain. Dunlop's plant doctor, Dr. Jan Davis, recommended that Allen be moved to light-duty employment that did not require "prolonged standing, walking, [or] climbing." (Emphasis added.) Dunlop reassigned Allen from the tire-building job to that of SRI Apex machine operator"one of the easiest jobs in the plant"after Dr. Davis inspected and approved the SRI work site for Allen. Operating his SRI Apex machine, Allen could sit for most of his 12-hour shift and had to climb only three stairs approximately three times per hour during the shift. Dunlop provided Allen with a stool that was designed to allow the operator to control the machine by using his right foot.
Without informing Dunlop, Allen sought the services of a third physician, Dr. John Bacon.[1] Dr. Bacon placed restrictions on Allen, prohibiting him from doing any squatting, climbing, or kneeling, and from working more than an 8-hour shift. Dunlop is a 12-hour-per-shift facility.
Faced with statements by two physicians, Dr. Davis and Dr. Horn, that Allen could perform the SRI Apex machine operator's job, and a statement by one physician, Dr. Bacon, that Allen could not, Dunlop had Allen report to his light-duty job as an SRI Apex machine operator. Allen started performing that light-duty job on February 23, 1993. Three days later, he filed a workers' compensation claim for his August 1992 knee injury. The following day, February 27, Allen alleged that he reinjured his knee while descending the three-step ladder on his SRI Apex machine.
Allen performed his light-duty employment without complaint until April 1993, when he complained of increased pain. On May 7, against the instructions of his supervisor, Allen walked off the job. Then, on May 28, after Allen had experienced numerous injuries; after nearly five years of total prior absences over an 18-year employment history, counseling regarding absenteeism, declining performance on the SRI Apex machine operator's job;[2] and after Allen had asserted that he could not perform his SRI Apex machine operator's job, even though it was the opinion of two physicians that he could, Dunlop finally suspended Allen, without pay. Dunlop told Allen that he was being suspended because (1) he had been placed in a job within his qualifications and had failed to perform that job, and (2) he had walked away from the job site, against the instructions of his supervisor. Dunlop instructed Allen that during his term of suspension it would evaluate his employment record to determine whether it would terminate his employment.
In July 1993, Dr. Bacon performed surgery on Allen's left knee, but Allen did not inform Dunlop of this surgery. Unaware of the surgery, Dunlop decided to terminate Allen. This decision was based on Allen's entire employment record, his diminishing performance, and his walking off the job *971 despite the medical opinions of Allen's treating physician, Dr. Horn, and the plant physician, Dr. Davis, that he could perform the SRI Apex machine operator's job. On September 17, members of Dunlop management met with Allen to inform him of the decision to terminate his employment for "failing to make proper effort to perform [his] assigned job, exaggerating [his] degree of alleged disability, and malingering." At the September 17 meeting, however, Allen arrived, with a cast on his leg, and announced that Dr. Bacon had performed surgery on his knee. Allen stated that he wanted to return to work. Accordingly, after a grievance meeting among Dunlop personnel, Allen, and Allen's union representative, Dunlop reinstated Allen in November, with full benefits. However, Dunlop was unable to find a job that Allen could perform in compliance with the post-surgery medical restrictions placed on him by Dr. Bacon. Accordingly, Allen did not return to work at Dunlop. Allen filed this retaliatory-discharge claim.

II.
Alabama's Workers' Compensation Act provides medical benefits, disability benefits, and numerous other benefits to employees who sustain work-related injuries. Ala.Code 1975, §§ 25-5-77; 25-5-57; 25-5-60; 25-5-111. Before 1984, however, the Alabama Legislature did not provide a cause of action for employees who were fired in retaliation for seeking workers' compensation benefits. In Meeks v. Opp Cotton Mills, Inc., 459 So.2d 814 (Ala.1984), this Court declined to create an exception to the employment-at-will doctrine for retaliatory discharges.
The legislatures and courts of some other states did provide a narrow exception to the employment-at-will doctrine for retaliatory discharge of those who sought workers' compensation benefits. See Theresa Ludwig Kruk, Annotation, Recovery for discharge from employment in retaliation for filing workers' compensation claim, 32 A.L.R.4th 1221-38 (1984). The exception took one of two forms: (1) that the filing for workers' compensation benefits was a substantial cause of the termination, see, e.g., Chism v. Mid-South Milling Co., 762 S.W.2d 552, 556 (Tenn.1988) (requiring that the filing for workers' compensation benefits be a "substantial factor" in the termination decision), Azar Nut Co. v. Caille, 720 S.W.2d 685, 687 (Tex.App.1986) (filing for workers' compensation benefits must be a "determining factor" in the termination decision), aff'd, 734 S.W.2d 667 (Tex.1987); or (2) that the filing for workers' compensation benefits was the sole cause of the termination, Frampton v. Central Indiana Gas Co., 260 Ind. 249, 297 N.E.2d 425, 428 (1973) (filing for workers' compensation benefits must be the sole cause of termination); Hansome v. Northwestern Cooperage Co., 679 S.W.2d 273, 275 (Mo. 1984) (stating that employee's filing for workers' compensation benefits must be the exclusive cause of termination).
In 1984, the Alabama Legislature made the policy decision to provide a narrow exception to the employment-at-will doctrine for a retaliatory discharge that occurred solely because of the filing of a workers' compensation claim. Section 25-5-11.1, Ala.Code 1975, provides in pertinent part:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits under this chapter...."
(Emphasis added.)
To survive a motion for a judgment as a matter of law on a claim for retaliatory discharge under § 25-5-11.1, an employee must make a prima facie showing that he was terminated for seeking workers' compensation benefits. Twilley v. Daubert Coated Products, Inc., 536 So.2d 1364, 1369 (Ala. 1988); Rule 50, Ala. R. Civ. P. Once a prima facie case has been established, the burden shifts to the employer to present substantial evidence indicating that the termination was for a legitimate reason. Id. Once the employer has demonstrated a legitimate reason for discharging the employee, the burden shifts back to the employee. The employee must then rebut the employer's proffered reasons with substantial evidence indicating that these reasons are mere pretexts for an otherwise impermissible termination. Id.; *972 see Lozier Corp. v. Gray, 624 So.2d 1034 (Ala.1993).[3]
Legitimate reasons for discharge (that is, reasons that are not a mere pretext for retaliation) may include "the employee's own shortcomings, such as unexplained tardiness, excessive absenteeism, lying with respect to previous compensation claims, or physical inability to do the job." 2A A. Larson, The Law of Workmen's Compensation, § 68.36(d), pp. 188-91 (1990); see, e.g., Smith v. Dunlop Tire Corp., 663 So.2d 914 (Ala.1995) (holding that an employer could terminate an employee pursuant to a "no fault" absentee policy even though the employee's absences were caused by work-related injuries); Noble v. AAA Plumbing Pottery Corp., 677 So.2d 765, 768 (Ala.Civ.App. 1995) (holding that "physical inability to perform a job, where the employer has no other jobs that the employee can perform, constitutes a legitimate, nondiscriminatory reason for termination of employment"); Terry v. Lee Apparel Co., 656 So.2d 811 (Ala.Civ.App. 1994) (upholding a summary judgment for an employer on a retaliatory-discharge claim where the employee was discharged for leaving work without permission).
Allen presented evidence indicating that Dunlop terminated him solely because he filed for workers' compensation benefits. Dunlop then presented evidence indicating that it terminated Allen because he either would not or could not perform his job.
Two physicians, Dr. Horn, Allen's treating physician, and Dr. Davis, the plant physician, stated that Allen could perform the light-duty SRI Apex machine operator's job to which Allen was assigned. Nonetheless, Allen walked off the job. Given this action and Allen's entire employment record, Dunlop terminated Allen's employment in September 1993 for lack of performance. Dunlop reinstated Allen in November, but at trial it presented evidence indicating that it was unable to find another even lighter-duty job at its 12-hour-per-shift facility that would comply with the medical restrictions prescribed by Dr. Bacon, Allen's new treating physician. This shifted the burden back to Allen to produce substantial evidence to rebut these two reasons and thereby leave Allen's filing for workers' compensation benefits as the sole reason for his termination. Allen attempts to rebut Dunlop's proffered reason that he either would not or could not perform his job, by arguing, first, that he really was disabled and, second, that he really was not disabled.[4]

A.
First, Allen argues that, consistent with Dr. Bacon's diagnosis, he really was disabled when he walked off his job, and thus that Dunlop's proffered reasonthat Allen would not perform his jobwas untrue. This is not substantial evidence to rebut Dunlop's position that it relied on the opinions of two of the three physicians, including Allen's treating physician, Dr. Horn, that Allen could perform his job.[5] Even if Dunlop had relied on the diagnosis of the third physician, Dr. Bacon, Dunlop had no 8-hour job for Allen to perform at its 12-hour-per-shift facility. Given Dunlop's prior history of working with *973 Allen's multiple injuries and absences, cf. Continental Eagle Corp. v. Mokrzycki, 611 So.2d 313, 319-20 (Ala.1992), one must conclude that Allen's attempted rebuttal fails to establish that the sole reason for Allen's termination was his filing for workers' compensation benefits. See Consolidated Stores, Inc. v. Gargis, 686 So.2d 268, 272 (Ala.Civ. App.1996) (noting that an implicit requirement for establishing a claim of retaliatory discharge is that the "employee must be willing and able to perform the job in order to assert a retaliatory discharge claim").

B.
Second, Allen attempts to rebut Dunlop's evidence that after Dunlop reinstated him, he could not perform any job available at the plant. Allen argues that he was capable of performing certain jobs at the plant. Dunlop presented forceful evidence indicating that it made a good-faith, but unsuccessful, effort to find an existing job that Allen could perform. First, Dunlop's labor-relations manager testified that he met with Allen and Allen's union representative to determine if there were any existing jobs that Allen could perform at the plant, given the job requirements and Allen's medical restrictions.
Under Dunlop's union contract, Allen was eligible only for those jobs for which he had seniority. Three jobs were explored: (1) maintenance clerk; (2) porter's cleaner; and (3) mold cleaner. Allen did not meet the educational requirement for maintenance clerk; thus, Dunlop's labor-relations manager explored whether the medical restrictions imposed after his July 1993 operation would prevent him from performing the porter's-cleaner job or the mold-cleaner job.
After Dr. Bacon's July 1993 operation on Allen's knee, Dr. Bacon permanently restricted Allen to 8-hour days, with "no standing or walking for fifteen minutes at a time, no climbing of stairs, no squatting, kneeling, or lifting more than fifteen pounds." Dunlop asked Allen to see another physician, Dr. Keith Anderson; it was Dr. Anderson's opinion that Allen, after his July 1993 operation, could work 12-hour days, but that Allen should be subject to the other permanent physical restrictions imposed by Dr. Bacon. Dunlop's labor-relations manager testified that, based on the post-operation physical restrictions upon which the medical experts agreed, Allen could not perform the porter's-cleaner job, because it required lifting and climbing stairs.[6] The labor-relations manager spoke with Dr. Davis regarding the mold-cleaner job and determined that Allen could not perform that job, because of the physical restrictions placed on him.[7]
In response, Allen offered only his own testimony that he could perform the jobs of mold cleaner and maintenance clerk. This testimony is insufficient under Twilley, 536 So.2d at 1369, to constitute substantial evidence that Dunlop's decision (that Allen could not perform the mold-cleaner and maintenance-clerk jobs) was a mere pretext and that the sole reason Dunlop terminated Allen was his filing for workers' compensation benefits. Allen testified at trial, "I have been physically unable to return to Dunlop." Further, Dunlop produced evidence indicating (1) that Allen had filed for private insurance disability benefits, claiming that a physical disability prevented him from working, and (2) that Allen had filed for Social Security benefits, claiming that a physical disability prevented him from working. In determining whether a plaintiff's evidence rises to the level of substantial evidence rebutting the evidence of the defendant, this Court must examine the weight and quality of that evidence. See generally K.S. v. Carr, 618 So.2d 707, 713 (Ala.1993) (stating that substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved") (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)) (emphasis added). Even under the old scintilla rule of evidence, let alone the substantial evidence rule applicable here, this Court concluded that contradictory statements *974 by a plaintiff failed to create a genuine issue of material fact to preclude a judgment as a matter of law. Robinson v. Hank Roberts, Inc., 514 So.2d 958, 961 (Ala.1987) (citing Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir.1984)). Accord Reigel v. Kaiser Foundation Health Plan, 859 F.Supp. 963, 970 (E.D.N.C.1994) (stating that with respect to claims under the Americans with Disabilities Act a plaintiff "cannot speak out of both sides of [his] mouth with equal vigor and credibility"). Under the significantly higher evidentiary standard embodied in the substantial evidence rule, I would hold that Allen's mere assertion that he could perform certain jobs fails to establish "substantial evidence" that Dunlop's stated reasonthat Allen could not perform those jobswas a mere pretext.[8]
Because Allen failed to offer substantial evidence that Dunlop's refusal to let him perform a job for which he is not qualified was a pretext, Allen's case depends on whether it is permissible for Dunlop to terminate his employment for his physical inability to perform his job. In Harrison v. Southern Pine Electric Cooperative, 603 So.2d 1004 (Ala.1992), this Court upheld a summary judgment for an employer on a retaliatory-discharge claim where the treating physician had indicated that the employee, who had suffered a work-related injury, was physically unable to perform his regular job or other jobs available at the employer's plant. Similarly, in Smith, 663 So.2d at 918-19, this Court upheld a summary judgment for an employer on a retaliatory-discharge claim where an employee was terminated for violating a neutrally applied absentee policy, even though his work-related injury precipitated the absences.[9]
Although it is not binding on this Court, the cogent opinion of United States District Judge Hancock in Cheatwood v. Roanoke Industries, 891 F.Supp. 1528 (N.D.Ala.1995), is particularly enlightening. Judge Hancock applied Ala.Code 1975, § 25-5-11.1, to a work-related injury for which Cheatwood had obtained a permanent medical restriction that disqualified him from any work at his employer's plant. Id. at 1533-34. In order to obtain disability benefits, Cheatwood represented that his medical disability prevented him from performing his job. Id. at 1534-35, 1540. Judge Hancock discounted the fact that Cheatwood had been terminated six months after filing for workers' compensation benefits and noted that Cheatwood had not informed his employer that his condition had improved to the point where he could perform his old job. Id. at 1540. Holding that the termination of an employee whose permanent disability prevented him from adequately performing his job was a termination for a legitimate reason, Judge Hancock stated:

*975 "`There is a distinction between a termination for the exercise by the worker of his rights under the worker's compensation law and a termination for inability to do the work, even if such inability is caused by an accident requiring the exercise of worker's compensation rights. The disability and partial disability benefits of the worker's compensation law are in recognition of this distinction.'"
Id. (quoting Cardwell v. American Linen Supply, 843 P.2d 596, 599 (Wyo.1992)); see Ala.Code 1975, § 25-5-57 (providing partial and total disability benefits for employees who sustain work-related injuries).
Similarly, after suffering a work-related injury, Allen obtained a permanent medical restriction for "no standing or walking for fifteen minutes at a time, no climbing of stairs, no squatting, kneeling, or lifting more than fifteen pounds." These restrictions disqualified him from any work at Dunlop's plant. In order to obtain disability benefits, Allen represented that his medical disability prevented him from performing his job. Allen was terminated six months after filing for workers' compensation benefits, and he never informed his employer that the permanent medical restriction had been lifted. Dunlop's termination of Allen's employment for physical inability to perform his job was legitimate. See Harrison, 603 So.2d 1004-05; Smith, 663 So.2d at 918-19; Cheatwood, 891 F.Supp. at 1540. Lambert v. Beverly Enterprises, Inc., 695 So.2d 44, 47 (Ala.Civ.App. 1997) (holding that an employee was properly terminated for inability to perform her duties and declining to expand the Alabama Workers' Compensation Act to include provisions that would require employers to make accommodations to assist employees in performing duties they otherwise would not be able to perform). Indeed, had Dunlop acted otherwise, it would have been acting contrary to Allen's safety and well-being. See Noble, 677 So.2d at 768 (stating that a failure to terminate an employee for a work-related disability that proscribed work at the employer's plant "would have demonstrated an almost total lack of concern for [the employee's] safety").
In my view, Allen failed to present substantial evidence indicating that there were no legitimate reasons for his termination and, thus, failed to present substantial evidence indicating that the sole reason for the termination of his employment was his filing for workers' compensation benefits. Accordingly, I would reverse the trial court's denial of Dunlop's motion for a judgment as a matter law and render a judgment in favor of Dunlop.[10]
Therefore, I dissent.
HOOPER, C.J., and MADDOX, J., concur.
SEE, Justice (statement of nonrecusal).
The plaintiff, Mickey Allen, through his attorneys, has moved for my recusal in this case.[11] Because the facts upon which the recusal motion is based are distinct from and unrelated to any material matter in this case, and, as a matter of fact and law, do not affect my impartiality in ruling on matters involving the plaintiff, I decline to recuse.

I.
In September 1996, during my campaign for this office, my campaign committee issued a press release that mentioned a political contribution and Mr. John M. Plunk. Beginning on April 16, 1998, Mr. Plunk's law firm, Alexander, Corder, Plunk & Baker, P.C., filed motions seeking my recusal in a number of cases, including this present case.[12] The recusal motion includes an affidavit *976 in which Mr. Plunk threatened to sue me based on his characterization of the statement in the press release as libelous. The recusal motion does not allege any actual or apparent bias on my part against the plaintiff.

II.
The law of recusal reflects two fundamental judicial policies: First, it is the duty of a judge to decide cases. Second, a judge should be a neutral, or impartial, decision-maker. The Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases. See U.S. Const. art. III, § 1 (vesting the "judicial Power of the United States ... in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish"); id. at art. VI ("[A]ll ... judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution...."); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("Article III establishes a `judicial department' with the `province and duty' ... to decide ... `case[s].'") (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (emphasis added)); Marbury, 5 U.S. at 180 (stating that a judge's oath to support the Constitution requires that he exercise the judicial power and decide cases in a manner consistent with fundamental law); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("It is a judge's duty to decide all cases within his jurisdiction...."); Ala. Const.1901 amend. 328, § 6.01(a) ("[T]he judicial power of the state shall be vested exclusively in a unified judicial system which shall consist of a supreme court ...."); id. at § 279 (requiring "all officers, executive and judicial, ... [to] take the following oath or affirmation: `I, ___________, solemnly swear ... that I will support the Constitution of the United States, and the Constitution of the State of Alabama ... and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter'"); Federated Guaranty Life Ins. Co. v. Bragg, 393 So.2d 1386, 1389 (Ala.1981) ("`[I]t is the duty of the judge to adjudicate the decisive issues involved in the controversy... and to make binding declarations concerning such issues, thus putting the controversy to rest ....'") (citation omitted).
The Due Process Clauses of the Constitution of the United States and of the Alabama Constitution require that a judge be a neutral decision-maker. U.S. Const. amend. XIV, § 1 ("No State shall ... deprive any person of life, liberty, or property, without due process of law...."); Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 617, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("[D]ue process requires a `neutral and detached judge....'"); Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (examining due process ramifications of a state Justice's financial interest in the outcome of a case on which he had ruled); Stallworth v. City of Evergreen, 680 So.2d 229, 233-34 (Ala.) ("An unbiased and impartial decision-maker is one of the most, if not the most, fundamental ... requirements of fairness and due process."), cert. denied, ___ U.S. ___, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996); Ala. Const.1901, § 6 ("[I]n all criminal prosecutions, the accused... shall not be ... deprived of life, liberty, or property, except by due process of law...."); id. at § 13 ("[E]very person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law...."); Ex parte Wilkey, 233 Ala. 375, 377, 172 So. 111, 113 (1937) (recognizing that §§ 6 and 13 of the Constitution of Alabama of 1901 require courts to be "impartial tribunals").
Thus, the recusal law embodied in statutes, court decisions, and codes of ethics reflects both the duty to decide cases and the requirement of impartiality. See, e.g., 28 U.S.C. § 455 (requiring federal judges to recuse themselves from any proceeding in which their "impartiality might reasonably be questioned"); Ala.Code 1975, § 12-1-12 (prescribing general grounds for disqualification of Alabama judges from the trial of cases). The following general rule is established by Canon SC., Ala. Canons of Jud. Ethics:
"(1) A judge should disqualify himself in a proceeding in which his disqualification is *977 required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding...."
(Emphasis added.)
Canon 3C's general rule of recusal must be applied in a manner that balances the policy requiring a judge to decide cases and the policy requiring a judge to be a neutral decision-maker. To support the policy of impartiality, the courts will require recusal not only for actual bias, but also for the appearance of bias. See, e.g., Ala. Jud. Inquiry Comm'n Adv. Op. No. 84-226 (1984) (stating that a judge should recuse when he has "become so biased or prejudiced because of the lawsuit that he could not give the client of the attorney or the firm the impartial hearing to which the client is entitled"); Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.) (stating that recusal depends on "whether there is an appearance of impropriety"), cert. denied, 513 U.S. 1007, 115 S.Ct. 528, 130 L.Ed.2d 432 (1994).
Where a party seeks a judge's recusal based on conduct of the judge that shows personal and official bias related to the case at bar, recusal will generally be required because the appearance of partiality outweighs the duty of the judge to decide that case. Crowell v. May, 676 So.2d 941, 944 (Ala.Civ.App.1996) (stating that "[t]he strictest application of this rule may `sometimes bar trial by judges who [are impartial] and who would do their very best to weigh the scales of justice equally between contending parties, ... to perform its high function in the best way "justice must satisfy the appearance of justice."'") (quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)).
On the other hand, in order to support the policy favoring the deciding of cases, the courts generally will not require recusal based on alleged personal, or unofficial, partiality that is not related to the case. See, e.g., Gipson v. State, 646 So.2d 701 (Ala. Crim.App.1994) (stating that recusal was not required where the attorney seeking recusal made allegations that the judge had manifested hostility toward him in the past and had unlawfully held the attorney in contempt in an unrelated proceeding); Henderson v. G & G Corp., 582 So.2d 529 (Ala.1991) (stating that a judge was not required to recuse where the judge had given testimony against the attorney in an unrelated proceeding); McLeod v. State, 581 So.2d 1144, 1153 (Ala. Crim.App.1990) (stating that the mere filing of a civil action by an attorney against a judge does not require the judge's recusal in unrelated matters concerning that attorney); see also, e.g., Ex parte Balogun, 516 So.2d 606, 609 (Ala.1987) (stating that there is a presumption that a judge is a neutral decision-maker) (citing Fulton v. Longshore, 156 Ala. 611, 46 So. 989 (1908)). Accordingly, where a party seeks to create an artificial appearance of bias by, for example, filing a separate lawsuit against the judge, recusal will generally not be required, because the duty of the judge to decide that case outweighs the appearance of partiality. "To hold otherwise would allow a litigant to control judicial proceedings whenever a litigant becomes dissatisfied with the course of the proceedings." Ala. Jud. Inquiry Comm'n Adv. Op. No. 97-686 (1997). Accord McLeod, 581 So.2d at 1153 ("`It is axiomatic that a litigant cannot control pending litigation by the mere filing of [a civil action] against the trial judge. To base disqualification on the mere filing of such an action would create chaos in the judicial system and could prevent cases from ever being tried.'") (quoting Ala. Jud. Inquiry Comm'n Adv. Op. No. 86-273 (1986)); 46 Am.Jur.2d Judges § 155 (1994) ("A judge is not automatically disqualified solely because a party in a case pending before the judge files a complaint against the judge ... [;] to hold otherwise would invite the filing of a ... complaint solely to obtain a judge's disqualification and would invite judge shopping.") (citing, e.g., Thomas v. State, 611 So.2d 416 (Ala.Crim. App.), cert. denied, 611 So.2d 420 (Ala.1992); Ham v. State, 540 So.2d 805 (Ala.Crim.App. 1988)).

III.
The motion for my recusal is based on a threatened lawsuit concerning a political *978 statement contained in a press release issued by my campaign committee during my 1996 campaign for this office. The political statement dealt with a campaign contribution and was in no way related to this case. Therefore, Mr. Plunk's threatened lawsuit does not require my recusal from this case. See Reach v. Reach, 378 So.2d 1115 (Ala.Civ.App. 1979) (refusing to require recusal of the trial judge in a proceeding involving a petition for an increase in child support, even though the attorney appearing before the judge had been the campaign manager for the attorney who opposed the judge in a recent judicial campaign), cert. denied, 378 So.2d 1118 (Ala. 1980); Richard E. Flamm, Recusal and Disqualification of Judges, § 21.5 (1996) ("The rule that suing a judge does not create legitimate grounds for disqualifying that judge applies, a fortiori, where suit against the judge has been threatened but not filed."); see also Ala. Jud. Inquiry Comm'n Adv. Op. No. 97-686; McLeod, 581 So.2d at 1153; Thomas, 611 So.2d 416; Ham, 540 So.2d 805.
Because the plaintiff's motion fails to establish actual or apparent partiality with respect to the case at issue, my constitutional duty to decide this case requires that I decline to recuse myself.
NOTES
[1] Allen had requested that another physician examine his knee. Because the treating physician, Dr. Horn, indicated that no further treatment of Allen's knee was needed, Dunlop declined to provide a third physician. See Ala.Code 1975, § 25-5-77(a) ("If the employee is dissatisfied with the initial treating physician selected by the employer and if further treatment is required, the employee may so advise the employer, and the employee shall be entitled to select a second physician from a panel or list of four physicians selected by the employer.") (emphasis added).
[2] Allen's performance ratings on the SRI Apex machine operator's job began high81% and 91% during February and March 1993but decreased to only 35% during May.
[3] Alabama has abandoned the "scintilla rule" of evidence, for the significantly higher standard embodied in the "substantial evidence rule." See Ala.Code 1975, § 12-21-12; Brown v. Gamble, 537 So.2d 476 (Ala.1989).
[4] Allen also argues that Dunlop acted in bad faith by placing him on an SRI Apex machine that required climbing, when a few of the SRI Apex machines required no climbing. Dunlop reassigned Allen from the tire builder's job, which placed significant stress on his knee, to the SRI Apex machine operator's job, which placed substantially less stress on his knee, only after Dr. Davis inspected and approved the SRI work site. This significant evidence of good faith is not undermined by the possibility that Dunlop could have removed some additional increment of stress. See Hammock v. Ryder Dedicated Logistics, Inc., 716 So.2d 215 (Ala.Civ.App. 1998) (holding that "under the workers' compensation law, [the employer is] not required to create a light-duty position, nor [is the employer] required to provide the employee with accommodations to aid his ability to perform the job") (citing Lambert v. Beverly Enterprises, Inc., 695 So.2d 44 (Ala.Civ.App.1997)).
[5] Allen also argues that Dunlop failed to use its standard termination procedure with him. Allen did not afford Dunlop an opportunity to do so, however, when he walked off the job and presented a medical prescription that prevented him from performing any job at Dunlop's 12-hour-per-shift facility.
[6] The maintenance-clerk job also required some climbing of stairs.
[7] After Allen's July 1993 operation, Dr. Horn did not reevaluate his original opinion that Allen could work 12-hour days.
[8] Although Dunlop did not expressly argue on appeal that Allen should be "estopped" from arguing that he could perform certain jobs, after he had stated that he could not perform any job, I note that the doctrine of estoppel would bar such a tactic. See, e.g., Consolidated Stores, Inc. v. Gargis, 686 So.2d 268, 274-75 (Ala.Civ.App. 1996) (holding that an employee who, for the purpose of obtaining Social Security disability benefits, asserted that he was disabled could not assert that he was not disabled, for the purpose of prosecuting his retaliatory-discharge claim); Garcia-Paz v. Swift Textiles, Inc., 873 F.Supp. 547, 554-56 (D.Kan.1995) (rejecting the plaintiff-employee's argument that she was terminated for a discriminatory reason in violation of the Americans with Disabilities Act where she had applied for and had received private insurance and Social Security disability benefits).
[9] Other courts have reached the same conclusion. See, e.g., Judson Steel Corp. v. Workers' Compensation Appeals Bd., 22 Cal.3d 658, 667, 586 P.2d 564, 569, 150 Cal.Rptr. 250, 255 (1978) (stating that employers are not required to ignore the realities of business and retain all injured employees or reemploy unqualified employees or employees for whom positions are no longer available); St. Clair v. District of Columbia Dep't of Employment Services, 658 A.2d 1040 (D.C. 1995) (holding that a physical disability that prevented an employee from working the number of hours required by his employer was a legitimate reason for termination); Conklin v. City of Newburgh, 205 A.D.2d 841, 613 N.Y.S.2d 287 (1994) (upholding an administrative decision for an employer on a retaliatory-discharge claim where termination was for excessive absences caused by medical restrictions arising from a work-related injury); Anderson v. Standard Register Co., 857 S.W.2d 555 (Tenn.1993) (upholding a summary judgment for an employer on a retaliatory-discharge claim where the termination was for excessive absences caused by medical restrictions arising from a work-related injury).
[10] Because I conclude that Dunlop terminated Allen for legitimate reasons, I pretermit discussion of Dunlop's allegations of jury misconduct and its argument that the trial court gave improper jury instructions.
[11] Although it is unclear whether the motion requesting my recusal is addressed to me or to the entire Court, recusal is a matter properly submitted first to the Judge or Justice whose recusal is sought. Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1089 (Ala.1984), vacated on other grounds, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). I therefore treat this motion as one directed to me.
[12] Members of Mr. Plunk's firm are the plaintiff's attorneys of record in this case. Mr. Plunk's name does not appear on the briefs for this case.