The defendants, Med-Plus Properties, a general partnership, and its two general partners, Dr. Charles B. Ferguson and Dr. Charles M. McGahey, appeal from a $125,000 judgment entered on a jury verdict in favor of the plaintiff, Colcock Construction Group, Inc. (hereinafter "CCG"). CCG, a general contractor, brought this action against the defendants (hereinafter collectively "Med-Plus"), alleging that they "wrongfully terminated" a contract to build a medical clinic in Colbert County, Alabama. Med-Plus raises three issues: (1) Whether the construction contract was illegal and therefore unenforceable on the basis that CCG violated § 34-8-6, Alabama Code 1975, by allowing an unlicensed general contractor to "superintend" construction of the clinic; (2) Whether the trial court erred in admitting CCG's estimates of the cost of completion under the construction contract; (3) Whether the trial court erred in directing a verdict in favor of CCG on Med-Plus's counterclaim alleging fraud.
On September 11, 1990, Dr. Ferguson and Dr. McGahey entered into a contract with Phillips Development Company to build a medical clinic. Ronald C. Phillips, a real estate developer and sole shareholder of Phillips Development Company, was a long-time friend and associate of Dr. Ferguson and Dr. McGahey. Phillips had helped them build two other clinics located in Florence and Decatur, Alabama. Under the terms of their September 11, 1990, agreement, Med-Plus and Phillips Development Company agreed to build a third clinic in Colbert County, Alabama, for $461,009. In addition to fixing the contract price, the agreement also specified the scope of the construction work and a schedule for the disbursement of these funds to Phillips Development Company after completion of certain stages of the construction.
Phillips began to hire subcontractors and to arrange for the purchase of materials. To pour the slab, Phillips had to have the City of Muscle Shoals inspect the site and issue a *Page 372 
building permit. To issue this permit, however, the City of Muscle Shoals required proof that the general contractor on the project was duly licensed. Because Phillips Development Company was not a licensed contractor, Phillips contacted CCG, which was then under a contract with Phillips to prepare architectural plans for the clinic. CCG was a licensed general contractor, whose officers and principal shareholders were two brothers, Jones Colcock and Miles Colcock. From the negotiations between Phillips, Jones Colcock, and Miles Colcock emerged an oral agreement whose purpose and terms were the subject of much contradictory testimony at trial.
According to Phillips, in exchange for a $10,000 fee Jones and Miles Colcock agreed that CCG would let Phillips use CCG's general contractor's license to build the clinic. Phillips also testified that under the terms of this oral agreement, CCG would assist Phillips in selecting and hiring subcontractors and would itself be allowed to perform whatever subcontracting work it was qualified to perform so long as its bid was as low as or lower than any other received by Phillips for the same work. Phillips also testified that CCG was only to be the nominal general contractor and that it was he who was to actually manage and control the construction project. According to Phillips, this authority included not only the hiring of subcontractors but also the paying of the costs of the project; he said CCG was to be a mere conduit for funds disbursed by the bank financing the project. Phillips's testimony was generally corroborated by the testimony of Dr. Ferguson and several subcontractors who worked on the project.
The testimony of Miles and Jones Colcock presented a very different picture of the oral agreement between Phillips and CCG. According to Miles Colcock, Phillips approached him in mid-September to inquire whether CCG would sell him its general contractor's license. Miles and Jones Colcock both testified that they refused to sell CCG's license. Finally, after subsequent negotiations, they said, Phillips offered to arrange a contract between CCG and Med-Plus in exchange for a $78,000 "finder's fee." According to Miles Colcock, under this arrangement, CCG was to be the general contractor and have complete authority, while Phillips was to be Med-Plus's agent on the project. Also, CCG was to hire and pay subcontractors and suppliers from funds disbursed under the contract.
Miles Colcock prepared a written agreement, almost identical to the one entered into by Med-Plus and Phillips Development Company. After signing this agreement, Phillips and Jones Colcock took it to Dr. Ferguson for his signature. On September 25, 1990, Phillips and Jones Colcock met Dr. Ferguson at his clinic in Decatur, Alabama. The meeting was brief, lasting no longer than 10 minutes, and several times during it Dr. Ferguson left the office to attend to patients.
At this meeting, it was explained to Dr. Ferguson that there had been a "hold up" in the progress of the construction project and that he would have to sign "this piece of paper" to obtain a building permit. Because the contract presented to him looked like the one that he, Dr. McGahey, and Phillips had signed on September 11, 1990, Dr. Ferguson signed it without reading its terms. The two-page document signed by Dr. Ferguson stated in the opening lines of its first paragraph:
 "This is a contract between CCG, Inc. and Med Plus Properties to construct a building and site improvements described in the drawings prepared by Miles Colcock, AIA, and Donald Phillips, ASLA."
(Emphasis added.) Dr. Ferguson testified at trial that he would not have signed the contract had he known it was anything other than a formality to obtain a building permit. Dr. Ferguson also testified that it was his understanding that Phillips was going to be the general contractor on the project.
Although the testimony concerning the substance of the representations made to Dr. Ferguson is generally undisputed, the testimony concerning who made these representations to Dr. Ferguson is not. Although Dr. Ferguson stated in his trial testimony what he understood after the meeting the agreement to be, he did not say what, if any representations, were made by Jones Colcock. According to Phillips, however, Jones *Page 373 
Colcock did make representations to Dr. Ferguson:
 "Q. Would you please detail for the jury exactly what, to the best of your recollection, what was said between Jones and Dr. Ferguson?
 "A. When I arrived I explained to Charlie [Dr. Ferguson] — Jones didn't say anything. I explained to Charlie, 'Charlie, to get a building permit we need to use and will be working with Jones Colcock who has an Alabama general contractor's license and I'm paying him a fee for doing this. It has absolutely nothing to do with the price of this project or your involvement or doesn't have anything to do with anything. It is simply a piece of paper that he says he needs.' Jones confirmed that. He said, 'Dr. Ferguson, it's just a piece of paper to get a building permit. We've got a little hang up down here with the city and they want to see something on paper.'
 "Q. All right. Now, when you say Jones confirmed that did he say exactly what you just said?
 "A. Pretty much exactly what I said. He confirmed everything I said."
Not long after the signing of the contract between Med-Plus and CCG, conflicts arose between CCG and Phillips as both sought to control the project. At first, there were no problems because most of the work on the project during the initial stage involved only CCG. This work consisted of preparing the foundation and pouring the slab. After this first stage was completed, CCG received from the financing bank the first installment payment of $92,200, of which $66,781 was paid to Phillips.
The second stage of the project consisted of exterior framing, roofing, exterior sheathing, and final "rough-in" plumbing, electrical, and heating and cooling work. During this stage of the project, the conflict between CCG and Phillips became acute. Without CCG's knowledge or consent, Phillips began hiring and paying subcontractors and suppliers directly. CCG attempted to assert control over Phillips and the project, but its efforts proved unavailing. Instead of being paid to CCG, as the first installment had been, the second installment of $161,353 was paid to Med-Plus and it was subsequently transferred to Phillips. After several failed attempts by CCG and Med-Plus to reach a solution, Med-Plus terminated the contract with CCG on November 27, 1990.
On May 8, 1991, CCG brought an action alleging breach of contract. Med-Plus answered with a general denial and asserted the affirmative defenses of novation, mistake, waiver, and excused performance. Med-Plus also included a counterclaim seeking damages from CCG for negligent construction. The parties amended these pleadings numerous times during the course of the circuit court proceeding. Relevant here, however, are amendments to Med-Plus's answer raising the affirmative defense of illegality and adding a counterclaim alleging fraud against CCG. At trial the circuit court granted CCG's motion for a directed verdict on the counterclaim alleging fraud and instructed the jury on CCG's claim alleging wrongful termination of contract and the affirmative defense of illegality. After entering a judgment for $125,000 on the jury's verdict in favor of CCG, the trial court denied Med-Plus's post-judgment motions for JNOV or new trial.
The first issue raised by Med-Plus is whether, with regard to its affirmative defense of illegality, the trial court erred in denying its motion for JNOV on the ground of insufficiency of the evidence in rebuttal to the defense or its motion for new trial on the ground that the verdict is against the great weight and preponderance of the evidence.
A motion for JNOV challenging the sufficiency of the evidence is measured by the "substantial evidence" rule. § 12-21-12(d), Ala. Code 1975, John R. Cowley Bros., Inc. v.Brown, 569 So.2d 375, 377 (Ala. 1990). The standard of review applicable to a motion for JNOV is identical to the standard used by the trial court in granting or denying a directed verdict motion. John R. Cowley Bros., supra; Alpine BayResorts, Inc. v. Wyatt, 539 So.2d 160 (Ala. 1988). Like a directed verdict, a JNOV is proper when the party with the burden of presenting evidence has failed to present "substantial *Page 374 
evidence" in support of its position. § 12-21-12(a), (c), Ala. Code 1975, John R. Cowley Bros., supra, "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
A jury verdict is presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new trial."
 Moreover, the denial of a motion for a new trial [on the ground that the verdict is against the weight and preponderance of the evidence] will not be reversed by this Court unless, after allowing all reasonable presumptions as to the verdict's correctness, the preponderance of the evidence is so against it that this Court is clearly convinced that it is wrong and unjust."
Deal v. Johnson, 362 So.2d 214, 218 (Ala. 1978); Edmondson v.Blakey, 341 So.2d 481, 485 (Ala. 1976). See Jawad v. Granade,497 So.2d 471, 474 (Ala. 1986).
Med-Plus argues first that the trial court erred in denying its motion for JNOV or its motion for a new trial because, it says, uncontradicted testimony showed that CCG engaged in a scheme with an unlicensed contractor to circumvent § 34-8-1 et seq., Ala. Code 1975, by allowing Ronald Phillips to "superintend" the construction of the medical facility. Therefore, Med-Plus contends, the contract is illegal and unenforceable by CCG.
Section 34-8-6, Ala. Code 1975, prohibits any person, firm, or corporation from engaging in the business of general contracting without a license. See also § 34-8-2, Ala. Code 1975. Section 34-8-6 also prohibits other acts and imposes a misdemeanor penalty on anyone who engages in those acts, such as "any person, firm or corporation presenting or attempting to file as its own the license certificate of another," and "any person including an owner, architect or engineer who receives or considers a bid from anyone not properly licensed under this chapter." Section 34-8-1(a) defines, in part, a "general contractor" or a person, firm, or corporation "engage[d] in the business of general contracting" as follows:
 "For the purpose of this chapter, a 'general contractor' is defined to be one who, for a fixed price, commission, fee or wage, undertakes to construct or superintend the construction of any building, highway, sewer, grading or any improvement or structure where the cost of the undertaking is $20,000.00 or more, and anyone who shall engage in the construction or superintending the construction of any structure or any undertaking or improvements above mentioned in the state of Alabama, costing $20,000.00 or more, shall be deemed and held to have engaged in the business of general contracting in the state of Alabama."
Although § 34-8-6 imposes a misdemeanor penalty for engaging in the acts prohibited therein, this Court has gone further, holding express or implied contracts with unlicensed "general contractors" to be unenforceable as a violation of public policy. Hawkins v. League, 398 So.2d 232 (Ala. 1981); Cooper v.Johnston, 283 Ala. 565, 219 So.2d 392 (1969). Such contracts are illegal and unenforceable by the unlicensed "general contractor." Twickenham Station, Inc. v. Beddingfield,404 So.2d 43 (Ala. 1981); Hawkins v. League, supra; Tucker v.Walker, 293 Ala. 589, 308 So.2d 245 (1975); see also Herbert v.Birmingham-Jefferson Civic Center Authority, 694 F.2d 240 (1lth Cir. 1982). See generally, Annot., Failure of Building orConstruction Artisan to Procure Business or OccupationalLicense as Affecting Enforceability of Contract or Right ofRecovery for Work Done, 44 A.L.R.4th 271 (1986). In order to ensure that the regulatory objectives of the licensing statute are met, this Court has held unenforceable contracts based on "creative schemes" designed to circumvent its requirements. J M Indus., Inc. v. Huguley Oil Co., 546 So.2d 367 (Ala. 1989);Cooper v. Johnston, supra. In J M Indus., the Court stated:
 "The importance of the regulatory nature of the statute, and the protection it affords the citizens of Alabama, cannot be avoided by unlicensed contractors who, through creative schemes, seek to circumvent the requirements of § 34-8-1 et seq. See, for *Page 375 
example, Cochran v. Ozark Country Club, Inc., 339 So.2d 1023 (Ala. 1976). Similarly, an unlicensed contractor will not be afforded the privileges that come from the statute because of its association with a licensed contractor (see Cooper v. Johnston, supra); because of its obtaining a license subsequent to the execution of the contract (see Architectural Graphics Construction v. Pitman, 417 So.2d 574 (Ala. 1982)); or because of the equally inequitable conduct of the other contracting party (see Cochran v. Ozark Country Club, Inc. [339 So.2d 1023 (Ala. 1976)])."
To support its argument, Med-Plus relies on the language of § 34-8-1(a) and this Court's decision in Cooper v. Johnston,283 Ala. 565, 219 So.2d 392 (1969). In Cooper v. Johnston, an unlicensed general contractor, A.R. Johnston, brought an action against the Coopers alleging breach of a contract to build a warehouse. Johnston agreed to pay a licensed contractor a percentage of the total cost of the construction project for use of its license. The issue in Cooper was whether Johnston's association with the licensed contractor in a joint venture made Johnston a licensed contractor, allowing it thereby to bring an action against the Coopers for breach of contract. The Court in Cooper held that because Johnston was not associated with the licensed contractor as an officer, partner, or employee, the agreement was merely an attempt to escape the regulatory requirements of the statute.
Although instructive, Cooper is distinguishable from this case. In Cooper, Johnston, the party who entered into the contract to construct the warehouse, was an unlicensed contractor who attempted to avoid the statute by associating with a licensed general contractor. In this case, however, CCG entered into a construction contract with Med-Plus and was a duly licensed general contractor. In the circumstances of this case, therefore, the question is whether any relationship of Phillips, an unlicensed contractor, to CCG, a licensed contractor, somehow renders CCG's otherwise valid contract with Med-Plus unenforceable.
We hold that the jury's verdict was both supported by sufficient evidence and not against the great weight of the evidence, because CCG introduced testimony tending to prove that CCG did not enter into the construction contract with Med-Plus for the purpose of allowing Phillips and Med-Plus to circumvent § 34-8-1 et seq. In their trial testimony, both Miles and Jones Colcock denied selling or allowing Phillips and Med-Plus to use their general contractor's license for a fee. Miles Colcock also gave lengthy, detailed testimony relating how, he claims, Phillips wrested control of the project from CCG. This and other evidence constituted substantial evidence from which a reasonable trier of fact could have inferred that the construction contract entered into by CCG and Med-Plus was not a creative scheme to avoid statutory licensing requirements by allowing Phillips to "superintend" the construction project.
Moreover, we are unable to say the jury's verdict was against the weight or preponderance of the evidence. The trial court properly instructed the jury on the affirmative defense of illegality, and, after considering the testimony and other evidence, the jury chose to believe CCG's account of the events and rendered a verdict in its favor. We see no reason to disturb the jury's finding.
The second issue raised by Med-Plus is whether the trial court committed reversible error in admitting into evidence CCG's estimates of what it would cost CCG to complete the project when evidence of the actual cost of completion, as performed by Phillips, was available.
"It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed."Cobbs v. Fred Burgos Constr. Co., 477 So.2d 335 (Ala. 1985); see also Comeq, Inc. v. Mitternight Boiler Works, Inc.,456 So.2d 264 (Ala. 1984); Files v. Schaible, 445 So.2d 257 (Ala. 1984); B M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala. 1979). In cases where the owner[1] has breached a construction *Page 376 
contract after partial performance, the proper measure of damages is the difference between the price agreed upon in the contract and the cost of performance, or, in other words, the contractor's "lost profit." Cobbs v. Fred Burgos Constr.Co., supra; Danforth Armstrong v. Tennessee C.R.R., 93 Ala. 614,11 So. 60 (1891); George v. Cahawba M.R.R., 8 Ala. 234
(1845); Whiting v. Dodd, 39 Ala. App. 80, 94 So.2d 411 (1957);J.B. Anderson Co. v. Brammer, 4 Ala. App. 596, 58 So. 941
(1912).
To prove damages, CCG presented documentary evidence and the testimony of Miles Colcock to establish the total cost of performance. To arrive at this figure, CCG first calculated the actual cost of performance on the project through the date of termination, November 27, 1992. To this figure, CCG added an estimate of the cost of completing the project after Med-Plus terminated the contract. CCG based this estimate on building plans for the clinic prepared by Miles Colcock and figures from CCG's preconstruction estimate.
Med-Plus makes several arguments to demonstrate that the trial court reversibly erred in admitting the CCG's estimate of the cost of completion to prove lost profits. CitingParis v. Buckner Feed Mill, Inc., 279 Ala. 148, 182 So.2d 880
(1966), and Brendle Fire Equipment, Inc. v. ElectronicEngineers, Inc., 454 So.2d 1032 (Ala.Civ.App. 1984), Med-Plus contends first that, as evidence to prove lost profits, the estimate of completion costs should not have been admitted because, Med-Plus says, the estimate was speculative and uncertain. Med-Plus argues that the estimate was based partly on builder's plans for the clinic, which, it says, did not include specifications for the "interior finishes," such as wallpaper, floor covering, etc. Such information, argues Med-Plus, could not have been known when the contract was terminated. Because this information was not known, Med-Plus argues, the estimate was necessarily uncertain and speculative.
Med-Plus also argues that CCG's estimate was not the "best evidence" of the cost of completion because there existed a record of all the checks written by Phillips to complete the project. Citing Brendle Fire Equipment, supra at 1034, Med-Plus contends that although uncertainty alone will not preclude recovery of lost profits, a plaintiff must present the "best evidence available to afford a reasonable basis for estimating his loss." In light of the availability of a record of the actual cost of finishing construction of the clinic, Med-Plus argues that CCG's estimate is not the "best evidence available."
Review of Med-Plus's arguments and the authority cited to support them reveals an ambiguity in the phrase "lost profit," as it is used in the case law to denote an item or element of damages recoverable in an action for breach of contract. The phrase "lost profit" has been used either to designate an item of what is often called "general" or "expectancy" damages, or to designate a form of "consequential damages." One commentator has observed:
 "Many claims for consequential damages are claims for loss of profits. The term profit is sometimes used loosely to refer to any gain the plaintiff would have made but for the contract breach. But some gains, such as gains in a simple market transaction, are not profits in the sense that income from business operations are profits. On the contrary, if the breach of contract causes the plaintiff to lose a market gain, the claim is merely one for general damages as to which no special proof requirements attach."
3 Dan Dobbs, Law of Remedies § 12.4(3), at 71 (2d ed. 1993); see also id. § 12.20(1). As Dobbs recognized, one relevant consequence of this distinction is that "special proof requirements" apply to consequential damages and not to general damages. In Alabama and other jurisdictions, the "special proof requirement" is embodied in the rule of "reasonable certainty." Morgan v. South Central Bell Telephone Co.,466 So.2d 107 (Ala. 1985). With regard to consequential, loss-of-profit damages, this Court has stated:
 "In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, *Page 377 
or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required."
Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149,182 So.2d 880, 881 (1966). The analysis advocated by Med-Plus and the authority it cites in support of it apply only to consequential, loss-of-profit damages; however, CCG seeks only general or expectancy damages, in order to place it in the position it would been in if Med-Plus had performed, i.e., the benefit of its bargain with Med-Plus. The rule of "reasonable certainty," therefore, does not apply.[2]
In light of the foregoing, we conclude that the applicable standard is the rule of relevance. See Charles W. Gamble,McElroy's Alabama Evidence § 21.01(1) (4th ed. 1991). After carefully reviewing the record, we hold that the evidence of the estimated cost of completion introduced by CCG was both material and probative. CCG presented testimony explaining why it did not use the record of Phillips's checks to show the cost of completing the project after Med-Plus breached the contract on November 27, 1992. Miles Colcock testified that many of Phillips's expenditures were not directly attributable to labor and materials necessary to complete construction of the clinic. Examples of actual payments not included in their estimate of the cost of completion were $6,047 to make payments on Phillips's and his brother Donnie's automobiles and $5,655 in house payments to Phillips's mother. We find from this and other evidence in the record that the jury could have reasonably found that CCG's estimate, and not ipso facto the record of Phillips's actual payments, represented the real cost of completing the contract. The trial court did not, therefore, err in admitting CCG's cost of completion estimate into evidence.
The third issue is whether the trial court erred in directing a verdict in favor of CCG on Med-Plus's counterclaim alleging fraud. Med-Plus argues that the record reveals substantial evidence tending to prove that Jones Colcock fraudulently induced Dr. Ferguson to sign the construction contract during the September 25, 1990, meeting. Med-Plus contends that, in his trial testimony, Phillips stated that during the meeting Jones Colcock "confirmed" Phillips's express representation that the document they wanted Dr. Ferguson to sign was a "mere formality" to obtain a construction permit.
The jury verdict rejecting Med-Plus's illegality defense, however, is inconsistent with the fraud allegation. The jury considered Phillips's testimony along with all the other evidence by which Med-Plus attempted to show that CCG had entered with Phillips into an oral agreement to allow Phillips Development to be the general contractor on the project by using CCG's license and presenting an appearance that CCG was the actual contractor. The jury, by awarding contract damages to CCG, necessarily held that it did not enter into such an agreement. Thus, a fraud verdict based on a finding that Jones Colcock misrepresented to Dr. Ferguson that Phillips would be the general contractor in spite of the "mere formality" of the contract naming CCG as contractor would have been inconsistent with the verdict for CCG on the contract count. Therefore, while there may have been evidence in support of the fraud claim, any error in directing a verdict on that claim was rendered harmless by the verdict requiring findings inconsistent with a verdict for Med-Plus on the fraud claim.
Moreover, the directed verdict may well be correct, because Dr. Ferguson could not have justifiably relied on any misrepresentation by Jones Colcock that the contract he and Phillips were presenting for signature was a "mere formality" for obtaining a building permit. The "justifiable reliance" standard adopted in Hickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), provides: "A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fullycomprehend the nature of the subject transaction and itsramifications, has not justifiably relied on the defendant's representation if that representation is 'one so patently and obviously false that he must have closed his eyes *Page 378 
to avoid the discovery of the truth.' " (Quoting SouthernStates Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala. 1989) (Hornsby, C.J., concurring specially) (emphasis added.) Dr. Ferguson was an intelligent, educated person with experience in contracting for the construction of clinic buildings for his partnership. If he had given a moment's thought to the contract he was signing or to the implications of the alleged representation that it was a "mere formality" to obtain a building permit, he surely would have realized that the legal effect of the contract was to make CCG, the licensed contractor, the general contractor on the project. Thus, he could not have justifiably relied on representations by Phillips and Jones Colcock to the contrary. Furthermore, the representation that it was a "mere formality" could mean only that it would have no effect other than to obtain the permit under false pretenses. Med-Plus would thus have been violating § 34-8-6 if it had entered into the agreement in reliance on the alleged representations. This illegal act by Med-Plus would preclude it from asserting that it had relied on the alleged representation.
For these reasons, the circuit court did not err to reversal in directing a verdict for CCG on Med-Plus's counterclaim alleging fraud.
The judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and ADAMS, STEAGALL and INGRAM, JJ., concur.
[1] We use the term "owner" here to mean all those who contract to have construction performed; it is not limited to those who are technically landowners.
[2] Beyond noting its irrelevance to the admissibility of CCG's estimates of completion costs to prove general damages, we express no opinion as to the legal validity of Med-Plus's "best evidence" argument.