SELLERS, Justice.
This wrongful-death action was tried to a jury, which returned a verdict in favor of "all defendants," which included the entity that operates Bullock County Hospital,[1] ERMDS, LLC, and the estate of Dr. Ireneo Domingo, Jr. The Bullock Circuit Court ("the trial court") entered a judgment on that verdict. The plaintiff, Alisa Ansley, administrator of the estate of James W. Ansley, deceased ("Ansley"), filed a postjudgment motion for a new trial. The trial court denied that motion, and Ansley appealed. We affirm.
I. Facts and Procedural History
At 2:07 p.m. on July 20, 2012, James W. Ansley ("James") presented to the emergency room of Bullock County Hospital ("BCH"), complaining of chest pain he had been experiencing for one or two days. James's condition deteriorated, and, at approximately 4:30 p.m., the decision was *250 made to transfer James to a different hospital, Baptist Medical Center South ("Baptist South"). James later died at Baptist South of pulmonary embolism (blood clots that had traveled to his lungs).
Dr. Domingo examined James when he arrived at the BCH emergency room. At that time, Dr. Domingo was employed as an emergency-room physician by ERMDS, LLC, which had contracted with the entity that operates BCH to provide medical staff to care for patients in BCH's emergency room. Dr. Domingo was also employed as a hospitalist by the operator of BCH. The parties agree that a hospitalist is a physician who works in a hospital and decides whether to admit patients to the hospital, primarily from the emergency room. The evidence in this case indicates that it is common in small hospitals for a hospitalist to also serve as an emergency-room physician.
At approximately 2:58 p.m., Dr. Domingo created a differential diagnosis identifying the medical conditions that could possibly be causing James's symptoms. Those conditions included, among others, myocardial infarction ; coronary artery disease ; pulmonary embolism ; and aortic dissection. At that time, Dr. Domingo believed that myocardial infarction was most likely responsible for James's symptoms. It is undisputed, however, that James was suffering from a pulmonary embolism.
The parties agree that the best method of detecting a pulmonary embolism is a CT scan with intravenous contrast dye. BCH could not diagnose a pulmonary embolism with its CT scanner, however, because the scanner did not have a contrast-dye injector.
At 3:36 p.m., results of basic lab tests that had been performed on James were returned. Shortly thereafter, Dr. Domingo entered an order calling for James to be admitted to BCH. The record is not entirely clear, but it appears that the order of admission was entered at or around 3:42 p.m. Ansley argued in the trial court that, upon entering the order to admit James to BCH, Dr. Domingo began providing care to James in his capacity as a hospitalist, as opposed to his capacity as an emergency-room physician. Ansley argues on appeal that, because BCH did not have the capability of diagnosing a pulmonary embolism, Dr. Domingo, acting as a hospitalist, should not have admitted James to BCH and should have instead transferred him immediately to Baptist South.
The record indicates that Dr. Domingo received the results of James's cardiac lab tests at 3:56 p.m.[2] Those test results showed that James had elevated levels of troponin, a protein that assists in muscle contractions and is released in the event of a myocardial infarction or a pulmonary embolism. Dr. Domingo believed that James's increased troponin levels were caused by myocardial infarction. He later agreed, however, that the elevated troponin was most likely caused by the pulmonary emboli that killed James.
During Dr. Domingo's deposition, portions of which were read to the jury, Ansley's counsel asked Dr. Domingo if there "was anything done between 2:58 [when the differential diagnosis was created] and 4:30 [when the decision was made to transfer *251 James to Baptist South] to rule out pulmonary embolism." Dr. Domingo responded:
"There was no indication to rule out [pulmonary embolism ] because the patient was stable. And ... the patient wasn't complaining of shortness of breath. He said he felt better. So the plan of action was really to admit the patient to rule out [myocardial infarction ]."
Dr. Domingo testified that James was at a low risk for pulmonary embolism and was more likely suffering from myocardial infarction. According to Dr. Domingo, the American Cardiology Society recommends that, if there is a strong suspicion that a patient has a myocardial infarction, the patient's troponin level should be monitored. Dr. Domingo testified that, before 4:30 p.m., "[t]here was no indication to do a [pulmonary-embolism ] workup."
At approximately 4:30 p.m., James went to the restroom in BCH's emergency room and became short of breath, diaphoretic, hypotensive, and hypoxic. Dr. Domingo testified that, at that time, he reexamined James and discovered that his condition had changed significantly. Accordingly, Dr. Domingo informed a BCH nurse that James was "not going to be admitted [to BCH]." Instead, Dr. Domingo ordered that James be transferred to Baptist South; James left BCH in an ambulance at 5:40 p.m. and arrived at Baptist South at 6:28 p.m. Dr. Domingo testified that "[t]he [pulmonary-embolism ] event when [James] became hypotensive was not foreseeable in [Dr. Domingo's] initial assessment." In Dr. Domingo's opinion, he did what he had believed "was best for the patient."
At approximately 6:55 p.m., test results were obtained at Baptist South that suggested the possibility of a pulmonary embolism. Physicians at Baptist South, however, suspected that James could have a dissection of the thoracic aorta. Accordingly, heparin, an anticoagulant, was not administered because it can cause a patient with aortic dissection to bleed to death.
A CT angiogram was performed at Baptist South at approximately 9:00 p.m. The results were provided to James's Baptist South physicians at 9:20 p.m. and confirmed that James was suffering from bilateral pulmonary emboli. James went into cardiopulmonary arrest around that time and was pronounced dead at 9:42 p.m.
After she was appointed as representative of James's estate, Ansley sued the entity that operates Baptist South, which settled with her. Ansley also sued Dr. Domingo and, based on his actions, ERMDS, LLC. In addition, based on Dr. Domingo's actions and the actions of BCH nurses, Ansley sued Inmed Group, Inc., d/b/a Bullock County Hospital, which Ansley claimed was the entity that operates BCH. See note 1, supra. Dr. Domingo died before the trial began, and his estate was substituted as a defendant. In her complaint, Ansley alleged that James's death resulted from the defendants' medical malpractice.
One of Ansley's expert witnesses, Dr. Benny Gavi, a hospitalist, testified as follows regarding the role of a hospitalist:
"A hospitalist is a doctor that works in the hospital and they take admissions into the hospital primarily from the emergency department. [A]nd so[, as a hospitalist,] I would get a call from the emergency department doctor, who says, I have a patient who needs to come into the hospital, are you willing to accept the patient? This is the medical history. And then I say, yes, I accept; or, no, I don't accept if there [are] issues. And then I take care of that patient in the hospital until they go home."
*252 Dr. Gavi testified that Dr. Domingo began functioning as a hospitalist when he entered the order to admit James to BCH. It appears undisputed that Dr. Domingo, in his capacity as an emergency-room physician at BCH, could not admit a patient to BCH. Ansley, however, has not pointed to evidence establishing that an emergency-room physician at BCH cannot make the decision to transfer a patient to a different facility.
According to Dr. Gavi, the standard of care requires a hospitalist to be aware of the capabilities of his or her hospital. He testified that a hospitalist should not accept a patient if the patient has "a condition that you couldn't treat" and that "it would not be safe to take someone with a potentially life threatening problem or problems to put them in a place where you couldn't evaluate those problems or treat them in the most effective manner." He also testified that BCH did not have equipment capable of ruling out a pulmonary embolism. According to Dr. Gavi, Dr. Domingo, acting as a hospitalist, breached the applicable standard of care by admitting James to BCH instead of transferring him to a more capable hospital.
Another expert witness called by Ansley, Dr. Jeffrey Kline, testified as to Dr. Domingo's alleged breach of the standard of care applicable to an emergency-room physician. He testified that Dr. Domingo should have transferred James to Baptist South when he received notice that James's troponin levels were elevated.[3]
Dr. Alan Jones, an emergency-room physician, testified for the defendants. Before Dr. Jones was called as a witness, Ansley objected to his providing "a standard-of-care opinion for the entire time that James ... was at [BCH]." She argued that, when the admission order was entered at 3:42 p.m., Dr. Domingo began caring for James as a hospitalist and that Dr. Jones, an emergency-room physician, "would not be similarly situated to Dr. Domingo after 3:42 p.m." The trial court denied Ansley's motion to limit Dr. Jones's testimony. According to Dr. Jones, Dr. Domingo acted appropriately in waiting to transfer James until 4:30 p.m., when his condition changed in the BCH emergency-room restroom. In her appellant's brief, Ansley does not discuss Dr. Jones's testimony, other than to point out that the trial court refused to limit its scope as she had requested.
The Court notes that Dr. Jones's responses to questions regarding Dr. Domingo's duty to transfer a patient to a more capable facility suggest that, for purposes of this case, the standard of care applicable to an emergency-room physician is very similar to the standard of care Ansley has argued applies to a hospitalist. Specifically, Dr. Jones testified as follows in response to questioning by Ansley's counsel:
"Q. Dr. Domingo should always make a determination of whether or not the patient is within the capability of the hospital. He should have done that here, right?
"A. And I believe he did.
"Q. He should do it, right?
"A. Yes, he should do it.
"Q. Right. And in order to comply with the standard of care, he has to make a determination as to whether or not this patient fits within this capacity of this hospital here, right?
"A. Yes.
*253 "Q. And if the patient doesn't, the obligation is to transfer the patient to somewhere that is within that capacity?
"A. Yes."
Similarly, the testimony of Dr. Kline, Ansley's expert emergency-room physician, indicates that an emergency-room physician should know the capabilities of his or her hospital and should transfer patients to a more capable facility if necessary.
As for causation, Dr. Gavi testified that, if Dr. Domingo had transferred James to Baptist South at 3:42 p.m. rather than admitting him to BCH, he would have lived. Dr. Kline testified that, if James had been transferred to Baptist South an hour earlier than he was (or if the CT angiogram at Baptist South had been performed an hour earlier), he would have lived. Dr. William Alleyne, an expert witness called by the defendants, testified as follows regarding causation:[4]
"Q. [By defendants' attorney:] Dr. Kline testified that in his causation testimony that if Mr. Ansley had gotten to [Baptist South] an hour earlier, he would have survived. Do you agree with that?
"A. No.
"Q. Why not?
"A. The patient, Mr. Ansley, complained of chest pain for one to two days before he came to the hospital. In hindsight, we know that this chest pain was due to blood clots in his lungs. By his statement that he had chest pain one to two days before he came to the hospital, we know that he had blood clots going to his lungs for that time. He arrives at the hospital at approximately 2:40 p.m. in the afternoon. Bloods are drawn, and they are available on the chart approximately one hour later, at about 3:30. Those bloods, the blood results, included this elevated troponin. So this elevated troponin was due to the right heart having to strain to try to pump blood through blocked pipes. The pulmonary embolism that had occurred or had-this process had begun somewhere between a day or two days prior to him coming.
"So once Mr. Ansley presents to the emergency room and he is being evaluated, the bathroom incident occurs. The bathroom incident is a syncopal episode, what you and I would call a fainting episode. We know, again, from knowing the result of why this was going on, he had a blood clot. That fainting spell, in conjunction with the lowered blood pressure, his blood pressure when he comes to the emergency room is, the top number, the systolic number is somewhere around 152. He has this fainting spell. Fainting spells can be caused by a variety of things. One of the things we know that can cause it is if you don't get enough blood flow to your brain. Mr. Ansley, following this bathroom incident, this fainting spell, had blood pressures that were initially in the 150 range, went into the 130 range, and at one point were in the mid nineties. So he has a significant drop in his blood pressure, which of course we know is a result of the blood clots and the inability for his heart to pump correctly and adequately to maintain his blood pressure. So we know that this process, that had been going on for at least a day or two prior to him coming in, continued while he was at [BCH], and ultimately caused his demise later that evening while at Baptist *254 [South]. The fact that he developed this fainting spell with the low blood pressure, lowered from where he presented, would be an example of what we call hemodynamic instability. That's a fancy doctor's term to mean that your blood pressure is not stable, your heart is not stable. So once that occurs, we know that the blood clot in the lung, what we call pulmonary embolism, is a massive pulmonary embolism, massive being defined as a blood clot that is sufficiently large to cause this hemodynamic instability. That puts you into a category of your survival, once you have had this hemodynamic instability, your survival is less than 50 percent, meaning that most of these patients die. So the fact that his presentation has now changed puts him into a different category. That different category means that although blood thinners will help, they will only help to prevent further damage. They don't prevent or reverse whatever process is already there. And we know that's significant, because again, he has this fainting spell, this syncopal episode, this hemodynamic instability. So at that point, the patient is more likely than not to die, and in my view, even had he gotten the blood thinner, the Heparin, I do not believe that he would have survived, and that is a point of difference in opinion between myself and Dr. Kline.
"Q. I think you just answered this. Dr. Kline said if he had been given Heparin when he was transferred, then he would have survived. Do you agree with that?
"A. I do not.
"Q. For the reasons you just said?
"A. Yes, sir.
"Q. Would earlier treatment have guaranteed his survival and prevented his death?
"A. No."
At the close of the evidence, Ansley filed a motion for a partial judgment as a matter of law ("JML"). She argued that the evidence established that, "[f]rom the time Dr. Domingo entered an admission order for [James], at approximately 3:30 p.m., until the time [James] left BCH, Dr. Domingo was providing medical care to [James] while acting as a hospitalist physician."[5] Ansley also asserted that Dr. Gavi, who testified that Dr. Domingo breached the standard of care applicable to a hospitalist, was the only witness to provide standard-of-care testimony regarding Dr. Domingo's actions as a hospitalist. Accordingly, Ansley argued, she was entitled to a JML "on the issue of [Ansley's] standard of care allegations regarding Dr. Domingo's treatment in his capacity as hospitalist." Ansley did not argue that she was entitled to a JML on the issue whether Dr. Domingo breached the standard of care applicable to an emergency-room physician or whether Dr. Domingo's actions proximately caused James's death. The trial court denied Ansley's motion for a partial JML.
Using a verdict form agreed upon by the parties, the jury returned a general verdict in favor of the defendants. The trial court denied Ansley's postjudgment motion for a new trial, and this appeal followed.
II. Discussion
A. Ansley's Motion for a JML
In her appellant's brief, Ansley suggests that she was entitled to a JML because, she says, Dr. Domingo breached the standard of care in failing to transfer James to Baptist South immediately upon creating the differential diagnosis, which *255 identified pulmonary embolism as a possible cause of his symptoms. As noted, however, Ansley moved for a JML only as to whether Dr. Domingo breached the applicable standard of care while allegedly acting as a hospitalist, which she claimed in her motion began when "Dr. Domingo entered an admission order for [James] at approximately 3:30 p.m." Ansley did not ask the trial court to enter a JML holding that Dr. Domingo breached the standard of care at an earlier point. Thus, she cannot make that argument on appeal. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992) (indicating that appellate courts will not consider arguments raised for the first time on appeal and that appellate review is restricted to the evidence and the arguments considered by the trial court).
Although not entirely clear, Ansley also appears to suggest that she was entitled to a JML on all elements of her medical-malpractice claim based on Dr. Domingo's conduct while allegedly acting as a hospitalist. In addition to evidence indicating that Dr. Domingo breached the standard of care applicable to a hospitalist, she points to evidence that, she claims, establishes that Dr. Domingo's alleged breach proximately caused James's death. Ansley, however, never asked the trial court to enter a JML on all elements of her medical-malpractice claim; she did not argue to the trial court that the evidence indisputably established causation. Accordingly this Court will not consider that argument on appeal.
Ansley's primary argument on appeal is that she is entitled to a new trial based on the trial court's alleged error in denying her motion for a JML on her claim that Dr. Domingo breached the standard of care applicable to a hospitalist. She asserts in her brief that, at or around the time the order to admit James was entered, Dr. Domingo's role "changed" from an emergency-room physician to a hospitalist. She points to the testimony of Dr. Gavi indicating that Dr. Domingo breached the standard of care applicable to a hospitalist, and she argues that Dr. Gavi's testimony was uncontroverted because, she asserts, the defendants did not present their own expert testimony to the effect that Dr. Domingo met or exceeded the standard of care.
The defendants, on the other hand, argue that a jury question existed as to whether Dr. Domingo acted as a hospitalist in determining whether and when to transfer James to Baptist South. Thus, they argue, the trial court did not err in denying Ansley's motion for a partial JML.
"A directed verdict [now, a JML] is proper on a claim where the facts are such that all reasonable men must draw the same conclusion from them. Turner v. Peoples Bank, 378 So.2d 706 (Ala. 1979). A plaintiff is entitled to a [JML] where there are no controverted issues of fact upon which reasonable men could differ. Loeb & Co. v. Martin, 295 Ala. 262, 327 So.2d 711 (1976)."
Continental Assurance Co. v. Kountz, 461 So.2d 802, 806 (Ala. 1984). In Lloyd Noland Hospital v. Durham, 906 So.2d 157, 168-69 (Ala. 2005), this Court said:
"The standard of review of an order denying a new-trial motion on the ground that the verdict is against the weight of the evidence is well established. 'No ground for reversal of a judgment is more carefully scrutinized or rigidly limited than the ground that the verdict of the jury was against the great weight of the evidence.' Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990). 'A jury verdict is presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new *256 trial.' Med Plus Props. v. Colcock Constr. Group, Inc., 628 So.2d 370, 374 (Ala. 1993).
" ' "Moreover, the denial of a motion for a new trial [on the ground that the verdict is against the weight and preponderance of the evidence] will not be reversed by this Court unless, after allowing all reasonable presumptions as to the verdict's correctness, the preponderance of the evidence is so against it that this Court is clearly convinced that it is wrong and unjust." '
" 628 So.2d at 374 (quoting Deal v. Johnson, 362 So.2d 214, 218 (Ala. 1978) ). The denial of such a motion ' "rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court's ruling constituted an abuse of discretion." ' Vaughan v. Oliver, 822 So.2d 1163, 1170 (Ala. 2001) (quoting Colbert County-Northwest Alabama Healthcare Auth. v. Nix, 678 So.2d 719, 722 (Ala. 1995) )."
Ansley asserted in her motion for a JML that the administrator of BCH, Jacques Jarry, testified that Dr. Domingo was acting in his capacity as a hospitalist when he entered the order to admit James. Jarry testified, however, that James was never actually admitted to BCH. Similarly, Dr. Domingo stressed that James was never transferred out of the emergency room. Dr. Domingo testified as follows:
"Q. [By Ansley's attorney:] So in your role as a hospitalist is when you decided to admit Mr.-
"A. Right.
"Q.-Ansley.
"A. Under my service, because he has no other doctor here.
"Q. Got it. All right. So to get this straight, your role as an ER physician you diagnosed him, came up with your differential diagnosis, got him to the point where he needed to be admitted. And then your role as the hospitalist for this facility-
"A. I will cover him during the stay-time he was here.
"Q. You admitted him.
"A. Yeah.
"Q. So the admission order, I believe [was] at 3:40, 3:30 time frame.
"A. Right.
"Q. From-so your ER hat would have been worn from 2:07 up until that point in time.
"A. Right.
"Q. And from 3:30 until his transfer, you would have [been] wearing your hospitalist hat.
"A. If-if we were able to transfer him to the floor, but he didn't make it to the floor. He was transferred [to Baptist South].
"Q. Well, he didn't make it to the floor, but-but you were still acting as a hospitalist at that point.
"A. Right.
"Q. Correct?
"A. Right. I was admitting him under my service."
Dr. Domingo testified that he planned to admit James to BCH. As noted, however, after the incident in the restroom of the BCH emergency room occurred at 4:30 p.m., Dr. Domingo informed a BCH nurse that James would not, in fact, be admitted to BCH.
Likewise, the nurse who cared for James when he was at BCH testified that there had been a plan to admit James to BCH but that he was never admitted because of the incident that occurred at 4:30 p.m. in the BCH emergency-room restroom. Similarly, Ansley's nursing expert testified as follows:
*257 "[By Ansley's attorney:] Okay. So it is the last page; and it is the history that's documented by Dr. Domingo. And it was documented at 15:50, and the plan that's documented there is telemetry and angina unstable.
"Q. That is the plan to admit with telemetry; correct?
"A. Correct.
"Q. Do you not understand that what Dr. Domingo was saying in that note is that he was planning to admit this patient to the hospital with telemetry?
"A. Correct.
"Q. But he never got admitted to the hospital, did he?
"A. At this point in time that was the plan.
"Q. That was the plan?
"A. And that was the plan when Mr. Ansley went to the bathroom at [4:30 p.m.].
"Q. It was still a plan to admit him but he was never admitted. He never left the emergency room, did he?
"A. He was transported.
"Q. Well, while he was at Bullock County Hospital, he was in the emergency department the whole time?
"A. Correct.
"Q. Did he change rooms?
"A. Not that I'm aware."
Medical bills from BCH show that James was charged for time spent in the emergency room, not for a room in the main hospital. Dr. Kline, an emergency-room physician, testified that Dr. Domingo violated the standard of care applicable to an emergency-room physician the entire time James was in the BCH emergency room.
In arguing her motion for a partial JML, Ansley's counsel acknowledged:
"Regarding the issue of whether there is a question of fact, that may be so because they have presented evidence that they don't believe that he was acting that way [as a hospitalist].
"But on the issue of if he was acting as a hospitalist, the [trial court] must find based on the evidence that he violated the standard of care."
Ansley has not demonstrated that there was no jury question as to whether Dr. Domingo acted in his role as a hospitalist in considering whether and when to transfer James to Baptist South. Accordingly, we reject her argument that the trial court should have granted her motion for a new trial based on the alleged error in denying her motion for a partial JML.[6]
Even assuming Dr. Domingo was acting in his capacity as a hospitalist, the Court is not convinced by Ansley's argument that Dr. Gavi's testimony regarding the standard of care and Dr. Domingo's breach thereof shifted the burden to the defendants to present their own expert testimony in support of their argument that Dr. Domingo did not breach the standard of care. Ansley points to Justice Cook's special concurrence in Taylor v. Hanner, 727 So.2d 68 (Ala. 1999), in which this Court affirmed, without an opinion, a trial court's order granting a plaintiff's motion for a new trial in a medical-malpractice action after the jury had returned a verdict for the defense. The trial court's ruling in Taylor was based in part on its determination that it had erred in refusing to enter a preverdict JML that the defendant medical provider had breached the standard of care. The trial court stated in its order:
" 'One cannot reasonably argue that the Defendant would not have sought and been entitled to a directed verdict [now, *258 a JML] in his favor had the Plaintiff failed to present substantial evidence of the statutorily defined breach of duty by the Defendant. Thus, the so-called level playing field that our system of justice must provide mandates [that] the Plaintiff [be] entitled to a 'partial [JML]' where the Defense fails to rebut a showing by the Plaintiff by substantial evidence that the Defendant breached his medico-legal duty to his patient, in this case, the Plaintiff's decedent.' "
727 So.2d at 69 (Cook, J., concurring specially). Ansley concedes, however, that Justice Cook's special concurrence in Taylor is not binding on the Court. Moreover, Justice Cook's special concurrence does not point to any authority clearly supporting the trial court's apparent suggestion in Taylor that the defendant's failure to offer his own expert testimony in response to the plaintiff's expert testimony required the entry of a partial JML for the plaintiff.[7]
Moreover, Ansley has not demonstrated that Dr. Domingo's own testimony was not sufficient to allow the jury to determine he did not breach the standard of care applicable to a hospitalist. Finally, even if we were to conclude that the trial court erred in denying Ansley's motion for a partial JML, Ansley has not demonstrated that the trial court lacked discretion to deny her motion for a new trial. She again improperly relies on Taylor, which is not binding and itself affirmed the trial court's exercise of discretion.
B. Testimony Regarding Financial Condition of BCH
Ansley argues on appeal that she is entitled to a new trial because the defendants presented evidence that, she asserts, constituted "extraneous and irrelevant matters of the [poor] financial status of [BCH]," and because the trial court refused to allow her to present rebuttal evidence of BCH's alleged wealth. Ansley points to the testimony of BCH administrator Jacques Jarry, whom Ansley called as an adverse witness.[8]
Jarry's testimony on cross-examination by defense counsel indicated that BCH is a small hospital that does not have the same capabilities as do larger hospitals. For example, he testified that other small hospitals near BCH have had to close, that BCH is a rural hospital that provides care to the citizens of Bullock County, that BCH is one of "three little hospitals [in the area] that work together," that BCH has had to "budget monies," and that Jarry personally has had to borrow money to pay BCH employees. Jarry also testified that BCH has "people that care" who work in the hospital "regardless of if we get any money out of it or not." Ansley asserts that Jarry's testimony was "not relevant to any claim or issue" and was "introduced solely for the improper purpose of engendering sympathy for [the] defendants."
Ansley's primary theory of liability during the trial was that BCH did not have equipment capable of diagnosing a pulmonary embolism and that Dr. Domingo therefore should have transferred James *259 to Baptist South sooner. On direct examination, Ansley repeatedly asked Jarry whether it would be unethical for a hospital to put its own financial gain ahead of patient safety. The suggestion by such questioning was that BCH, while not having sufficient proper diagnostic equipment, would nevertheless admit patients who should be transferred to a more capable facility in order to earn a profit at the expense of patient safety. Jarry was also asked about his own personal interests in entities that stood to gain financially from the operation of BCH. After plaintiff's counsel objected during cross-examination to Jarry's testimony regarding BCH's modest financial state, the trial court stated: "So I'm supposed to let you on direct [examination] talk about them having an old CT machine and let you talk about on direct [examination] that financial gain can't ever be put above patient safety, but then they can't respond to any of that?" Thus, it is clear the trial court determined that Jarry's testimony was relevant in part because of Ansley's suggestion that BCH and Jarry were more interested in profit than in protecting patients and to explain why BCH did not have the equipment necessary to diagnose and treat a pulmonary embolism.
"[W]hen evidence of financial worth goes to a material issue in the case, it is admissible." Johns v. A.T. Stephens Enters., Inc., 815 So.2d 511, 516 (Ala. 2001). Moreover, "[e]vidence regarding a party's financial condition may also be admissible when the party's opponent has opened the door by commenting upon or asking questions concerning [the] party's financial standing." Hathcock v. Wood, 815 So.2d 502, 509 (Ala. 2001) (quoting I Charles W. Gamble, McElroy's Alabama Evidence § 189.05(2)(c) (5th ed. 1996) ). "A trial court's ruling on the admission or exclusion of evidence will be reversed only if it is shown that the trial court exceeded its discretion in so ruling." Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 7 (Ala. 2007). Ansley has not demonstrated that the trial court exceeded its discretion in allowing Jarry's testimony or in refusing to allow Ansley to present evidence of BCH's alleged wealth.
III. Conclusion
Ansley has not demonstrated that the trial court exceeded its discretion in denying her motion for a new trial. Accordingly, the trial court's judgment is affirmed.
AFFIRMED.
Stuart, C.J., and Parker, Wise, and Mendheim, JJ., concur.
Bolin, Shaw, and Bryan, JJ., concur in the result.
Main, J., recuses himself.

There is some confusion regarding the entity that operates Bullock County Hospital. Alisa Ansley originally sued Inmed Group, Inc., d/b/a Bullock County Hospital. Later, Ansley amended her complaint to substitute Professional Resources Management, Inc., d/b/a Bullock County Hospital, as the entity that operates Bullock County Hospital. At some point during the trial, the parties agreed to refer to the operator of Bullock County Hospital by a combination of the names of the two entities, specifically, "PRM d/b/a Bullock County Hospital/Inmed." In her notice of appeal, Ansley identified the relevant appellee as Inmed Group, Inc., d/b/a Bullock County Hospital. Nevertheless, an attorney representing Professional Resources Management, Inc., made an appearance in the appeal via a request for more time to file an appellee's brief, although he later withdrew that request. Ultimately, Inmed Group, Inc., and not Professional Resources Management, Inc., filed an appellee's brief. In a portion of that brief, Inmed Group, Inc., argues that the appeal should be dismissed as to it. Because the Court affirms the trial court's judgment, however, we pretermit discussion of whether the proper entity has been made an appellee, and the request to dismiss is moot.

In her appellant's brief, Ansley points to Dr. Domingo's deposition testimony indicating that he received the results of the cardiac lab tests earlier-at 3:09 p.m. The evidence at trial, however, indicates that Dr. Domingo likely was mistaken during his deposition and that he received those results at 3:56 p.m. The Court also notes that the trial court entered a pretrial order containing a stipulation of facts stating that, "[a]t 3:56 p.m., the Cardiac Panel report listed [James's] Troponin 1 as critical."

Dr. Kline also testified that Dr. Domingo should have given James an anticoagulant. On appeal, Ansley does not rely on Dr. Domingo's decision to not administer an anticoagulant in support of her argument that Dr. Domingo's malpractice caused James's death.

On the day the trial began, the trial court granted Ansley's motion to preclude Dr. Alleyne from testifying as to a hospitalist's standard of care because he was not a similarly situated medical provider to Dr. Domingo. Thus, Dr. Alleyne was allowed to testify only as to causation.

Although Ansley asserted in her motion that the admission order was entered at 3:30 p.m., much of the evidence suggested that it was entered at 3:42 p.m.

Ansley does not clearly argue on appeal that she was entitled to a partial JML and a new trial even if there was a jury question as to whether Dr. Domingo acted as a hospitalist.

It is noteworthy that Ansley requested and received jury instructions to the effect that the jury in the present case did "not have to accept [expert] opinions and testimony just because they are experts" and that the jury was to "determine [an expert witness's] credibility just like [it] determine[d] the credibility of the other witnesses."

Ansley also asserts that defense counsel commented on BCH's finances during opening arguments and on the finances of Dr. Domingo's estate during closing arguments. There is, however, no transcript of opening or closing arguments in the record, and Ansley has not demonstrated that we should consider statements that do not appear in the record.